STATE v. KENNETH R. ADAMS, Appellant.—No. 40167.—200 S. W. (2d) 75.

Division Two, March 10, 1947.

Raymond S. Roberts, T. A. Matthews, M. C. Matthes, and Louis E. Zuckerman for appellant.

1188

*J. E. Taylor*, Attorney General, and *Robert L. Hyder*, Assistant Attorney General, for respondent.

BOHLING, C.—Kenneth R. Adams appeals from a judgment imposing a sentence of two years' imprisonment upon conviction for embezzling funds of the Bank of Leadwood. (Sec. 4471, R. S. 1939.) He contends the State did not make a submissible case; that error was committed in the manner of examining a witness, in the admission of evidence, and in the giving and refusing of instructions.

Appellant succeeded to the presidency of the Bank of Leadwood, Missouri, a corporation, upon the death of John S. Towl and ▇▇▇ was also President of the First State Bank of Bonne Terre, Missouri. Leonard A. Meesey was Cashier of the Bank of Leadwood from 1940 to May 12, 1943, when he confessed to a shortage of $21,200, which shortage is not questiond, and resigned as Cashier. Appellant and Miss Clara Evans were coexecutors of the estate of John S. Towl, deceased. The State's theory was that appellant and Meesey acted together in the commission of the offense. Appellant and Meesey were officers of the Bank and within the provisions of Sec. 4471, supra, if appellant's connection with the embezzlement was established. Several transactions are embraced in the total sum charged to have been embezzled and an understanding of the situation calls for a statement in greater than ordinary detail.

O. O. Wyrick, an Examiner for the Department of Finance of the State of Missouri, examined the Bank in May; 1943. He identified exhibit A as a ledger sheet kept in the bank records and exhibit B as a ledger sheet found in the lockbox of Cashier Meesey. Exhibit B reflected the true condition of the account of the Towl estate with the Bank while exhibit A reflected the false condition of said account overs the years 1941, 1942, and 1943. Exhibit B showed a deposit in the Towl account on February 6, 1941, of $12,050 whereas exhibit A showed a deposit of $17,150.92, a difference of $5,100. Exhibit B showed a withdrawal of $5,900 on April 18, 1941, whereas exhibit A showed no withdrawal. Exhibit B showed a withdrawal of $1,000 on June 7, 1941, whereas exhibit A showed no withdrawal. Exhibit B showed a withdrawal of $4,000 on December 31, 1941, whereas ex-

hibit A showed no withdrawal. April 29, 1942, exhibit A showed a deposit of $17,935.99, whereas exhibit B showed a deposit of only $13,335.99, a difference of $4,600. These discrepancies total $20,600. The balance after said deposit of $17,935.99 in the Towl account was $56,069.91 on exhibit A and after said deposit of $13,335.99 was $34,869.91 on exhibit B. A Bank of Leadwood duplicate deposit slip in Meesey's lockbox showed "Deposited to credit of estate of John S. Towl by K. R. Adams, Adm. 4-29-1942"; as follows:

```
"Currency ................................$17,935.99
Silver Less KRA .......................... 3,400
 _____
Checks as follows ....................... 14,535.99
Less L A M .......................... 1,200
 _____
 $13,335.99
```

```
(Erasure)
 3400
 700
 ____
 2700 Cash . 13,335.99"
```

"KRA" are the initials of appellant while "L A M" are the initials of Leonard A. Meesey, Cashier of the Bank.

Exhibit D is appellant's $600 check of July 11, 1941, on the First State Bank of Bonne Terre, Missouri, and payable to the estate of John S. Towl, and endorsed: "Estate of John S. Towl by K. R. Adams, Adm." Exhibit E is a deposit slip of the Bank of Leadwood for $600 to the credit of the Towl estate, dated 7-22-41, with the notation: "Sale of Bank Stock." These were found in Cashier Meesey's lockbox. Exhibit A shows a deposit corresponding with the slip but we find no corresponding deposit on exhibit B. When the Examiner questioned appellant concerning this transaction appellant stated he purchased Bank of Leadwood stock from the Towl estate; that he paid "by check"; that he would know if a $600 check against his account was not paid as he did not carry a very large account; that, when shown the $600 check had never been paid and inquired of how payment had been made, he remembered he took the cash over and paid for it. Appellant was then informed that his check and the deposit slip were found attached together in Meesey's lockbox and was asked why he had not picked up his check when he paid the cash. Appellant replied that "he was loose in his business and trusted Mr. Meesey and didn't bother to pick up the check."

A $6,200 check against the Towl estate account came into the Bank of Leadwood on January 8, 1943. The account had a credit balance of $2,856.46 as shown by exhibit B. Several transactions resulted. A deposit of $6,200 appeared to the credit of the Towl estate account in the Bank without any deposit actually being made

by the estate. A $6,200 sight draft was issued by Cashier Meesey against the First State Bank of Bonne Terre. The Bank of Leadwood, however, had no funds to its credit with the First State Bank of Bonne Terre. Appellant was Secretary of the Bonne Terre Building & Loan Association. A $6,200 demand note of said Association, dated January 11, 1943, and signed by appellant as Secretary, appeared in the assets of the Bank of Leadwood and a cashier's check of even date for $6,200 was issued by Meesey and made payable to appellant's Bonne Terre Bank. Payment of the $6,200 check against the Towl estate was thus effected. The Examiner questioned appellant concerning these transactions. Appellant stated the $6,200 note was not a valid note (it was later charged off the books as worthless); that he had signed the note and, asked to explain, stated finally that he had been in the habit of signing blank notes and leaving them at the Bank in case he wanted to borrow and Meesey would fill them in although he knew it was necessary to secure the approval of the Board of Directors for loans to officers. When asked why he paid said sight draft, there being no funds on hand for its payment, appellant said he had no explanation; that when Meesey sent the sight draft over he paid it without questioning. Appellant also mentioned in this connection that he received Meesey's Cashier's check, which appellant said Meesey apparently paid with the $6,200 note. The Examiner then pointed out to appellant that the sight draft reached appellant's Bonne Terre Bank on January 11; that the note appeared in the Leadwood Bank on January 11 and that the Cashier's check was issued on January 11 and was received at the Bonne Terre Bank on January 11, and "that it couldn't go through the mails, and there had to be some traveling somewhere, but he didn't, of course, tell me how it got there or anything."

March 10, 1943, Miss Evans gave appellant a $5,000 check to invest for her. The Bank's ledger sheet showed a balance of only $3,907.67 in her account. A $7,000 purported note of Richard Francis dated July 15, 1942, and payable to the Bank is connected with the transaction. This loan of $7,000 was in excess of the amount the Bank could lawfully lend to one person. The Bank's register of notes receivable shows that appellant approved this and other loans over his signature. On March 10, 1943, the Bonne Terre Building & Loan Association made a deposit of $10,000 in the Bank of Leadwood by issuing its check, executed by appellant, against the First State Bank of Bonne Terre, although at the time there was to its credit in said Bank of Bonne Terre only $8,389.97. This deposit, however, was not credited to the account of the Bonne Terre Building & Loan Association but $7,000 was used to take up the $7,000 Francis note (on which no interest was ever paid) and $3,000 was deposited to the credit of Miss Evans that her $5,000 check might clear. When asked concerning these transactions, appellant stated to the Examiner, in

substance, that the Bonne Terre Building & Loan Association never had a deposit in the Bank of Leadwood; that the Association had some extra funds and he thought it would be nice to split the account and take part of it to the Bank of Leadwood. When the Examiner pointed out to him that the Association had been borrowing money from banks and did not have extra funds or sufficient funds to its credit to meet the $10,000 check he issued and an overdraft had been created by issuing it, appellant made no reply. The Examiner also pointed out to appellant that the Francis $7,000 note was two months past due; that Miss Evans' $5,000 check was up for payment and the Bank's records showed she had insufficient funds to meet it; that it was peculiar the $10,000 came in at that time, and asked why he chose that particular time. Appellant made no explanation.

Appellant also stated to the Examiner that the employees of the Bank had never made any complaint to him concerning the Bank carrying notes and other items as "cash." Miss Jewel Neel, an employee of the Bank, noticed several irregularities, particularly the $7,000 and the $6,200 items mentioned above. She testified she took up the $7,000 item with appellant several times; that is, carrying the note as cash on the Bank's books and why there was no security. Appellant made on explanation, but told her it would be taken care of. She stated she did not want to work where things were irregular and appellant told her if she would continue everything would be taken care of and "run on the level and that nothing would happen." She finally wrote the Commissioner of Finance concerning the situation. This witness was present at a meeting between the Examiner and appellant and other employees of the Bank and was asked to state what she had previously told appellant. Appellant denied that she had said anything and told her that she was always butting into something that she had no business with. Witness was of opinion that the signature on the $7,000 Francis note was in Meesey's handwriting but could not say for sure that appellant had signed it.

Several of the grounds urged by appellant with respect to the sufficiency of the evidence are repeated in attacks against the propriety of the given instructions. They embrace contentions of error, among others, on the theory the information charged appellant with the embezzlement of $21,200 of the Bank's money on the — day of May, 1943, on the theory the information failed to charge that appellant and Meesey were acting together, and on the theory there was no showing that appellant personally converted the money to his personal use. Of these in their order:

 It would be better practice to have the information embrace the time expected to be covered by the evidence and to restrict the instructions to the time actually established as involved. However, time was not of the essence of the instant offense and the situation

is within the observations in State v. Lomax, 322 Mo. 86, 93 (II.), 14 S. W. 2d 436, 438[2]: "It is said that defendant's demurrer to the evidence should have been sustained, because a single embezzlement was charged, while the proof developed that the total sum charged as embezzled involved a number of peculations at various times. The case of State v. Pratt, 98 Mo. 482, 11 S. W. 977, ably treats and holds the position taken by defendants to be untenable, thus obviating the necessity of elaborating the discussion." See also State v. Gebhart, 219 Mo. 708, 119 S. W. 350; Tucker v. Kaiser (Banc), 176 S. W. 2d 622, 625[7-9]; State v. Hamlin, 351 Mo. 157, 171 S. W. 2d 716; State v. Roussin, 354 Mo. 522, 189 S. W. 2d 983[1].

■ Appellant was not charged with the misdemeanor of a conspiracy (Secs. 4632, 4633, R. S. 1939) but with the felony of embezzlement. The conspiracy, if any, between appellant and Meesey was incidental to the offense charged, an evidentiary fact; and it was not necessary for the information to allege the conspiracy in order to prove the crime was committed in the pursuance of a conspiracy. State v. Kolafa, 291 Mo. 340, 347, 236 S. W. 302, 305; State v. Parr, 296 Mo. 406, 419, 246 S. W. 903, 906; State v. Pope, 338 Mo. 919, 924[2], 92 S. W. 2d 904, 907[7].

■ And, as we have said: ". . . the rule is that 'to make out a case of embezzlement, accused need not appropriate the property to his own use, but is guilty if he fraudulently appropriates it to the use of another.'" State v. Edward, 345 Mo. 929, 936[5], 137 S. W. 2d 447, 451[11]; 29 C. J. S. p. 683, Sec. 11, nn. 26, 27.

■ From Miss Neel's testimony appellant understood the $7,000, the $6,200, the other transactions she complained about, and what the Bank's records disclosed in connection with them, including the records falsely showing non-cash items as cash. He assured her if she would remain with the Bank, things would be taken care of, run on the level and nothing would happen. When the Examiner first discussed the situation with appellant, insisting upon Cashier Meesey being removed, appellant evidenced concern whether there would be a prosecution and upon being informed that usually rested with the Bank's directors and not with the Finance department or the bonding company, stated the situation would work out nicely; that there would be no prosecution; that the bonding company could pay, Meesey could get out of the Bank and they would not have any publicity. At a subsequent meeting the Examiner told appellant further investigations showed appellant connected with the shortages and asked appellant to resign rather than force ■ him to go before the Directors of the Bank. Appellant refused. At that meeting appellant stated he had not been in touch with Cashier Meesey during the examination of the Bank but when confronted with the fact that others had seen him with Meesey, appellant stated he had forgotten. The evidence warranted findings that appellant and Cashier Meesey

conspired to embezzle the Bank's moneys. The jury could infer that both had a 'direct connection with the $6,200 item. Appellant, as coexecutor, would know of the $6,200 distribution check against the Towl estate account. Meesey issued the $6,200 sight draft against Bonne Terre Bank of which appellant was President when the Leadwood Bank had no funds therein. Appellant, as Secretary, then issued the $6,200 note of the Building & Loan Association. Meesey then issued the Leadwood Bank's $6,200 cashier's check payable to the Bonne Terre Bank. The transactions could not be effected in the usual course of business by mail in one day. Someone was traveling between the two Banks. All this resulted in a $6,200 credit to the Towl estate when no deposit was made therein that the $6,200 check could be honored. And, of course, the appellant was directly connected with the $10,000 purported deposit of the Building & Loan Association of March 10, 1943, used to pay off the $7,000 Francis note and to meet the $5,000 check of Miss Evans he held for investment. There is much more to this evidence than mere bookkeeping entries by a cashier, which appears to have been the extent of the proof in State v. Davis, 315 Mo. 1285, 1291, 292 S. W. 430, 432.[2], stressed on the issue by appellant. In the instant case there was affirmative evidence that appellant had knowledge of the false entries on the records of the Bank and also evidence of his active participation in the transactions causing those entries. The several transactions covered by the evidence could not have been carried out in the manner shown to have been effected had either appellant or Meesey performed his duty as an official of the Bank.

██ With appellant and Meesey each acting for himself and as agent of the other in the furtherance of the conspiracy the exhibits found-in Meesey's lockbox were competent evidence to throw light on the handling of the transactions involved. Consult 22 C. J. S., Criminal Law, Secs. 775, 776; State v. Casto, 231 Mo. 398, 132 S. W. 1115.

██ Cashier Meesey, brought from the penitentiary for the purpose of testifying for the State, refused to answer when the prosecuting attorney's questions became material, stating he desired to stand on his constitutional rights and not incriminate himself. After the witness definitely made this known, the State's attorney was permitted to cross-examine him by questions of a leading nature concerning a statement or deposition he had made; whether the appellant had not offered him $10,000 to assume the whole blame and "take the rap"; whether that agreement had not been partly carried out and $1,900 paid to him by appellant after the closing of the Bank; and whether money had not been left for him by appellant at a certain office on two different occasions. If appellant offered Meesey $10,000 to take full responsibility and relieve appellant of his involvment in

the embezzlement or made a part payment to Meesey of $1,900 in that behalf, such fact or facts would have been prejudicial to appellant, as was also the affirmative implications arising from the circumstances attending Meesey's questioning, especially so in view of Meesey's refusal to answer based upon his claim of constitutional privilege on the ground his answer might further incriminate him.

A similar factual situation developed in State v. Gregory, 339 Mo. 133, 144(II), 149, 96 S. W. 2d 47, 53(II), 56[11], and questions, carrying no greater implication of the defendant's guilt, to a witness who refused to answer were considered prejudicially erroneous. One's witness may surprise and disappoint him by failing to testify or by testifying in favor of the opposite party. A mere refusal to testify or testimony negative in nature indicating a lack of testimonial information does not present the grounds for impeaching the witness that affirmative testimony in favor of the opposite party gives for inquiry concerning prior statements contradictory of the testimony under oath at the trial. Prior contradictory unsworn statements have probative ▪ value for the purpose of discrediting the witness that his factual testimony under oath be destroyed and not to establish the fact stated in the extra-judicial statements. A failure to testify leaves no facts before the jury to be destroyed by discrediting the witness through proof of prior contradictory statements. See also State v. Bowen, 263 Mo. 279, 283, 172 S. W. 367, 368; State v. Hogan, 352 Mo. 379, 382[2], 177 S. W. 2d 465, 466[3].

▪ A complaint against instruction No. 2 (the State's main instruction) not heretofore covered in effect is on the theory there was no evidence that appellant had possession and control of the moneys of the Bank of Leadwood, appellant contending Cashier Meesey had the actual possession and control of said moneys. The instruction informed the jury that where two or more persons act together with a common intent in the commission of a crime the act of one is the act of each and all so acting. If appellant and Meesey were consummating their conspiracy to embezzle the Bank's money, Meesey's possession was in law appellant's possession; and a jury would so understand. This instruction could readily be redrafted to eliminate the criticisms leveled against it.

Refused instruction D-11 was to the effect appellant was not to be convicted upon a suspicion he might be guilty. It was sufficiently covered in the several instances wherein the jury were required to find the facts established guilt beyond any reasonable doubt before convicting. We have considered the other complaints with respect to the giving or refusing of instructions. We think they need not be developed because what we have said rules the contentions against appellant; for instance, there was sufficient evidence to submit the existence of a conspiracy between appellant and Meesey.

1196

For the error connected with the examination of witness Meesey, the judgment is reversed and the cause is remanded. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.