ELAINE DELAY, APPELLEE, v. HOMER BRAINARD, SHERIFF OF DODGE COUNTY, NEBRASKA, APPELLANT.

156 N. W. 2d 14

Filed January 26, 1968. No. 36594.

Richard L. Kuhlman, for appellant.

Harry E. Stevens, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

Relator, who was charged with the crime of manslaughter, was granted a writ of habeas corpus against the respondent, the sheriff of Dodge County, Nebraska, who prosecutes this appeal.

Relator contended the evidence introduced at the preliminary hearing before a justice of the peace was insufficient to show that a crime was committed, and further there was no probable cause to believe she committed the offense.

On March 24, 1966, a fire broke out at the home of the relator in Fremont, Nebraska. The alarm was turned

in at 9:45 a.m. The fire department arrived within 10 minutes thereafter. The firemen broke into the house and removed three children, aged 3½ years, 1½ years, and 6 months, who were alone in the house. Relator, their mother, was gone, and the door was locked on the outside with a hook and eye fastener to keep the children inside. The 6-month-old baby was found dead in its crib, with severe burns over 80 percent of its body. The autopsy report indicates that the baby was alive and well before the fire. The other two children were hospitalized.

Relator was located by a social worker who telephoned a downtown bar where relator said she was having a bottle of pop. Relator had been leaving the children alone during the early part of the morning for several weeks before the fire. She put the hook on the outside of the door after a social worker had found the children outside the house on a previous occasion. Relator told an investigator that she was waiting at the bar for a cab she had called to return home. The call for a cab was verified. Subsequently relator admitted that she had been at the apartment of a bartender she had been seeing for sometime, and that she had gone to the bar to call the cab. After she was located at the bar she did not wait for the cab but went directly to the police station where she arrived at 10:30 a.m.

The district court found the evidence insufficient to establish the crime of manslaughter, determined that relator's statements and admissions secured during the investigative process were inadmissible at the preliminary hearing, and granted the writ. We first address ourselves to the last point.

A preliminary hearing did not exist at common law. In this jurisdiction it is provided for by statute. Its functional purpose is stated in section 29-506, R. R. S. 1943. A preliminary hearing before a magistrate is not a criminal prosecution or trial within the meaning of our

Constitution. See Roberts v. State, 145 Neb. 658, 17 N. W. 2d 666.

We have repeatedly held that a preliminary hearing is in no sense a trial of the person charged in regard to his guilt or innocence. Its purpose is to ascertain whether or not a crime has been committed, and whether or not there is probable cause to believe the accused committed it. Fugate v. Ronin, 167 Neb. 70, 91 N. W. 2d 240. The effect of the foregoing, if found to exist, is to hold the accused for trial in district court, which has jurisdiction to try him. See Dobrusky v. State, 140 Neb. 360, 299 N. W. 539.

In a habeas corpus proceeding instituted for the purpose of testing the sufficiency of evidence taken at the preliminary examination to require a person to be tried on a criminal charge, the court will not weigh the evidence but only inquire as to the existence of evidence to sustain the charge. Neudeck v. Buettow, 166 Neb. 649, 90 N. W. 2d 254.

Evidence that would justify a committing magistrate in finding that probable cause existed for the detention of a defendant need not necessarily be sufficient to sustain a verdict of guilty when he is placed on trial. Rhea v. State, 61 Neb. 15, 84 N. W. 414.

The rule that the accused is entitled to the benefit of any doubt does not apply in preliminary examinations. The test if not whether guilt is established beyond a reasonable doubt but whether evidence worthy of consideration in any aspect for a judicial mind to act upon renders the charge against the accused within reasonable probabilities. Circumstantial evidence may be sufficient basis to bind the accused over to the district court. See 21 Am. Jur. 2d, Criminal Law, § 449, p. 451. In the reception of evidence a committing magistrate is not strictly governed by technical rules applicable on a final trial. Harmer v. State, 121 Neb. 731, 238 N. W. 356. We have held voluntary confessions with slight corroborative evidence sufficient for purposes of a pre-

liminary hearing. Cotner v. Solomon, 163 Neb. 619, 80 N. W. 2d 587. To change this rule when we require prompt preliminary hearings would tend to make the preliminary hearing a trial and could seriously impede criminal prosecutions. As we view the record for purposes of a preliminary hearing, there is sufficient evidence to find that there is probable cause to believe the relator committed a crime if a crime was committed.

This raises the question then whether or not, assuming the evidence to be true, it constitutes a crime. Section 28-403, R. R. S. 1943, provides: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter; and upon conviction thereof shall be imprisoned in the Nebraska Penal and Correctional Complex not more than ten years nor less than one year."

Section 38-116, R. R. S. 1943, provides: "It shall be unlawful, and it is hereby declared to be cruelty for any person employing or having the care, custody or control of any child, willfully or negligently to cause or permit the life of such child to be endangered, or the health of such child to be injured, or willfully to cause or permit such child to be placed in such a situation that its life or health may be endangered, or to cause or permit such child to be overworked, cruelly beaten, tortured, tormented or mutilated."

Relator was in violation of a positive statute, section 38-116, R. R. S. 1943, when she locked her 3 children under 4 years of age in the house and took off on her own pleasure. Her husband left the home before 7 a.m. She got up shortly thereafter and drank some coffee. There is no evidence as to the exact time she left home, but she walked downtown and spent some time in her paramour's apartment. Relator did state she usually went downtown about 9 a.m. She would get back in time to get lunch for her husband who came home at noon. In any event, she was unavailable from before 9 a.m. until

she was located at the bar about 10:25 a.m. The fire alarm was turned in at 9:45 a.m. It must be conceded that the children were incapable of taking care of themselves. Relator was courting trouble. The law holds one so situated that his act may endanger the life of another to a high degree of caution, and he may be criminally responsible for loss of life consequent on his failure to exercise a proper degree of caution. When we apply the test of the reasonable man, we are forced to the conclusion that relator was deliberately jeopardizing the lives and safety of the children. She had a legal duty to see that they were protected, but left them unattended for long periods of time. Such neglect is criminal in its character and where it results in death will sustain a conviction for manslaughter. The negligence on which a charge of involuntary manslaughter is predicated may be the omission of an act which it is a person's duty to perform. 1 Wharton's Criminal Law and Procedure, § 296, p. 621.

In Stehr v. State, 92 Neb. 755, 139 N. W. 676, 45 L. R. A. N. S. 559, Ann. Cas. 1914A 573, we said: "For a parent having special charge of an infant child to so culpably neglect it that death ensues as a consequence of such neglect is manslaughter, although death or grievous bodily harm were not intended." That case involved neglect to seek medical aid for a stepson who had frozen his feet.

The degree of negligence which will make one criminally responsibile for a neglect of duty is difficult to define. Obviously, it is not any slight breach of duty but rather a gross failure to do what is required of one. On the record herein, we cannot say as a matter of law relator could not be guilty of manslaughter. Culpable neglect in omitting to perform a legal duty will sustain a manslaughter conviction. Relator had a legal duty to protect the children. She deliberately locked them in the house alone while she went off to pursue her own pleasures. As a result, one of them was burned to death.

It is for a jury to determine whether the conduct of relator crosses the line where her breach of duty renders her criminally negligent.

For the reasons given, we reverse the judgment of the trial court and remand the cause with directions to return relator to the custody of respondent to stand trial.

REVERSED AND REMANDED WITH DIRECTIONS.

McCown and Smith, JJ., dissenting.

We respectfully dissent. The district judge in granting the writ of habeas corpus here specifically stated the basis for the order. He did not believe the evidence introduced at the preliminary hearing established the crime of manslaughter. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, was effective. Objections were interposed and argued on the basis of Miranda, both at the preliminary examination and in the briefs here. The trial judge specifically found that: "* * * substantially all the evidence even if it does establish a crime was obtained in my opinion in violation of the rules set forth in the Miranda decisions and therefore inadmissible * * *."

It is deemed necessary to review the record with respect to the statements of the defendant, the facts surrounding the taking of them, and which portion of the evidence at the preliminary hearing was established by the defendant's statements.

Shortly before 10:35 a.m., detective Homes of the Fremont police department was just leaving the police station with a camera to go to the scene of the fire when he was met by the county attorney on the steps of the police station. The county attorney told him that Mrs. Delay would be coming in to the station and identified Mrs. Delay when she came.

The defendant's first statement was taken from her by detective Homes at the police station commencing at 10:35 a.m. Detective Homes at that time advised the defendant that she did not have to tell him anything and that anything she said could be used in court against her.

He typed the statement as he talked to her. This first statement showed that on that morning the defendant had gotten up sometime after 7 a.m., had some coffee, and that the children were still in bed asleep when she left the house; that she had walked downtown and had just run out of the house for a little while; that she had stopped at Saeger's Bar and had a bottle of pop; that this was the first and only place she went downtown; and that while there, she was contacted by a representative of the welfare department who told her that there had been a fire at her house and she was supposed to call the police department. She hung up the telephone and walked directly to the police department.

At this point appears the only blank line in the statement. The remainder of this first statement deals with her prior habits and customs when she left the children alone and revealed also that she was familiar with and frequently visited at least two local bars. The first statement was completed at approximately 11:15 a.m.

Detective Homes testified that he was conferring with the county attorney on and off all day long; and that he talked to him at noon and gave him the information obtained from the defendant. The defendant was never told at any time that she was free to leave and when she left the room to use the restroom, Mrs. Losee, the police clerk, went with her.

At 2:20 p.m. that afternoon, detective Homes took another statement from the defendant. Essentially, this statement had nothing whatever to do with her actions or conduct on the day of the fire, but dealt only with her conduct in connection with the children prior to that day. This statement showed that about 2 months before, she had started as a regular thing to leave the children home alone, usually in the mornings; that she never had anyone stay with them; and that the times she left were sometimes before 9 a.m. and her return was sometimes as late as shortly before noon. It also showed

that a representative of the welfare department had given her "the devil" for leaving the children alone. This statement was concluded and signed by the defendant at approximately 2:50 p.m.

At 3:40 p.m., the defendant asked to consult with a lawyer when she was told she would be held on a charge of manslaughter. She talked to her lawyer briefly by telephone and she and detective Homes were told that he would be there at approximately 5 p.m. The defendant was booked on a manslaughter charge at 5 p.m. and taken to jail. At 9:30 p.m. that night, detective Homes and another police officer went to the jail and again began "visiting" with the defendant. In detective Homes' words, they were "trying to fix the time she would have left the house."

At this conversation, the defendant told them that upon leaving the house she had gone to the apartment of a bartender, and that she had been going there for several months; and that she was there that morning after leaving the house, and had gone from the apartment to Saeger's Bar to call a taxicab and go home at the time she received the call to contact the police. She also told them that some weeks before she had installed a hook and eye lock on the outside of the one door to the house which was not obstructed. This was after a welfare department representative had found her children running around outside. She also told them that she had been locking the lock for several weeks, and had locked it that morning when she left.

All of these statements of the defendant, both written and oral, were admitted over strenuous objection at the preliminary hearing. At none of them were the required Miranda warnings given, and the last and most damaging one was taken after the officers knew the defendant had a lawyer.

Except for the defendant's own statements, the evidence at the preliminary hearing established only that there had been a fire at defendant's house at 9:45 a.m.;

her children were in the house alone; that no one, including the fireman who testified, knew how the fire commenced nor how long it had been burning; that the defendant was not present; and that her daughter was dead as a result of the fire.

This case is subject to the requirements of Miranda as well as prior and related cases dealing with in-custodial interrogation and the right to counsel. It seems crystal clear that the constitutional requirements applicable to in-custody interrogation of the defendant were not met. If trial had been involved rather than a preliminary hearing, the statements of the defendant could not have been introduced in evidence. Her own statements were the only evidence which might have completed the required proof that a crime had been committed.

In 22 C. J. S., Criminal Law, § 340, p. 879, it is stated: "* * * although the magistrate is not strictly governed by technical rules in the reception of evidence, the admissibility of evidence at the preliminary examination is governed by the same rules as those governing admissibility at trial." It is also stated: "* * * the principle, stated infra § 345, that less evidence is required to hold accused for trial than is exacted to support a conviction, does not go to the competency, relevancy, or character of the evidence."

In Cotner v. Solomon, 163 Neb. 619, 80 N. W. 2d 587, we held that the sufficiency of evidence adduced at a preliminary examination to hold an accused to answer for a crime with which he is charged may be raised and tried in habeas corpus proceedings, and also held that even a voluntary confession is insufficient standing alone to prove that a crime has been committed.

At a preliminary hearing we see no justifiable reason why the admissibility of a confession, admission, or statement of a defendant stemming from custodial interrogation should not be governed by the same constitutional rules as those governing its admissibility at trial. This

is emphatically true where the confession, admission, or statement is necessary to prove the essential requirement at a preliminary hearing that a crime has been committed.

The prosecution at the preliminary hearing only had the burden of establishing a body of facts sufficient to show that the crime of manslaughter was committed and that there was probable cause to believe the defendant committed it. It should not be permitted to flesh out the bare bones of the factual skeleton with confessions, admissions, or statements of the accused, obtained in violation of her constitutional rights, which would be inadmissible at the trial itself. When such statements are admitted not only to prove probable cause that the defendant was the one chargeable with responsibility, but also to establish the essential foundation fact that a specific crime has been committed, the effect of the error may well be compounded later. From the standpoint of efficient judicial administration, it is far better to correct such an error at an early stage when it may still be remediable.

While we can say nothing favorable as to the conduct of the defendant, either as a mother or otherwise, and this dissent in no way reflects a determination that she was innocent of any crime other than manslaughter, she is entitled to the constitutional rights of every citizen.

The district court found that the evidence introduced at the preliminary hearing in this case did not establish the crime of manslaughter, and that substantially all of the evidence at the preliminary hearing was obtained in violation of the constitutional rights of the defendant and was, therefore, inadmissible. We believe that the determination was correct in all respects and should have been affirmed.

WHITE, C. J., concurring.

I thoroughly agree with the majority opinion that there is sufficient evidence to bind the defendant over for trial on the merits to the district court. However, I wish to point out that this determination is in no way

controlling, or even indicative of the proper disposition of the issue of proximate cause, on the trial of this case. The determination of this issue must abide the exploration of all of the evidence on the trial of the case on its merits. It is not necessary that the evidence at a preliminary hearing be sufficient to support a verdict of guilty or that it show guilt beyond a reasonable doubt. State ex rel. Pribyl v. Frank, 165 Neb. 239, 85 N. W. 2d 328; Neudeck v. Buettow, 166 Neb. 649, 90 N. W. 2d 254. The purpose of a preliminary hearing is not to determine guilt or innocence, but simply to determine whether society is justified in holding a defendant so that the issue of guilt or innocence may be fully explored after an investigation and presentation of all of the evidence on the relevant issues. As soon as this clear demarcation line between the purposes of a preliminary hearing and the trial on its merits is understood, most of the questions presented in this case have cleared up. The purpose of the criminal law is to protect society. The integrity and adaptability of the adversary system of criminal justice to accomplish this purpose and yet protect the rights of defendants is one of the great principles of our constitutional system. It is for the courts to protect the basic principles of fairness, not only to the defendant but also to the State. I do not believe that our adversary system should become distorted into a racing game in which the essential issue of guilt or innocence is not the final objective but rather whether, *under the prompt constitutional urgency of an immediate preliminary hearing,* society can be forced to produce immediately after arrest all of the competent and relevant evidence necessary to establish the guilt of the defendant beyond reasonable doubt. The concept of fundamental fairness within the due process clause requires, within the framework of our adversary system, that the defendant's rights are fully protected in all of their developing and burdensome ramifications. By the same token, it should be permitted as a minimum that the

State, be given a full opportunity to explore, investigate, and present the evidence of guilt in order to carry this increasingly onerous burden. In our laudable constitutional zeal to protect individual rights we should not permit our adversary system of criminal jurisprudence to become distorted and perhaps converted into a device for the escape of the guilty and a mockery of the truth.

The record before us reveals grave questions as to the issue of proximate cause. I fail to see, at this point, how defendant's clandestine purpose or motivation in visiting her paramour is at all relevant to either the issue of neglect or proximate cause. This is a manslaughter case, and intent or purpose or motive is immaterial. Her conduct would be neither more nor less culpable or causative if her absence was for the purpose of visiting her minister, or, for that matter, absenting herself to consult with a social welfare agency about the care of her children. Is the fact that she removed herself from the visual proximity of her children, or the length of time that she so removed herself, the competent producing or proximate cause of the child's death? The direct cause of this child's death was a fire occurring not more than an hour and a half or two hours after she left the home. Just how the balance of the three or four hour period of time she was gone is relevant to the establishment of the issues of neglect and proximate cause in this case does not appear at this time. I see considerable difference, even as a matter of law, between a case in which a hungry child after being left alone all day drinks a bottle of poison liquid left exposed, and one, in which a child is killed in a crib as a result of a fire a few minutes after the mother has left (even in her own home) and is out of the visual and hearing proximity of her child for a considerable time later. And, it may be that the detailed facts surrounding the exact location of the child, the previous conduct of the mother, and the possible conditions which might result in danger to the child which were present and should have been

known to the defendant, all may be highly relevant to determine the crucial issue of guilt and proximate cause in this case. I shall not take the facts as they rather sketchily appear in this record and attempt to relate them precisely to the rationale of the relevant rules of law as to proximate cause. Intentional misconduct is irrelevant but reasonably foreseeable harm and the legally imposed risk resulting therefrom are highly relevant issues. The close question of whether they may be determined as a matter of law or whether they present a jury question must abide determination of the case on its merits.

Turning now to the dissent, which further extends the thrust of Miranda to preliminary hearings, I feel that something further should be said in this respect. First, the defendant came voluntarily to the police station. Her statement was taken beginning 5 minutes after the time she arrived. There is not a suggestion or intimation in this record that there was any compulsion, coercion, intimidation, or "psychological pressure" exerted on her. There was a complete absence, as I read the evidence, of any Miranda-declared implied coercion resulting from an "in custody" required interrogation by the police officers. She was not being detained for the purpose of eliciting incriminating admissions. The defendant was not arrested or informed that charges would be presented against her until late in the afternoon, as the majority opinion points out. Investigation was the emphasis and not the accusatory interrogation. The plain implication of the dissenting opinion is to the effect that voluntary disclosure of information to the police, if made at the police station, is prohibited as an "in custody" interrogation under the Miranda doctrine. This unwarranted expansion we cannot conceive to be the law even under the furtherest reach of the Miranda holding. Unless police interrogation is to be indicted absolutely, there must be some minimum requirement of affirmative action on their part

over the physical custody and control of a defendant before the implied coercion of an "in custody" interrogation can be held to become operative. Despite the innuendoes and declarations made in many of the United States Supreme Court opinions on this subject, I do not believe that the courts can or should ever declare that coercion begins at the door of the police station as a matter of law.

Second, the evidence shows conclusively that, despite the voluntary nature of the defendant's statements, she was affirmatively warned of her right to remain silent and that anything she might say might be used against her. Is it possible that a voluntary statement, made after such a warning, is so inherently constitutionally evil and objectionable that society and law enforcement may not even use it in the apprehension and detention of an accused?

Third, after all of her statements were made, the defendant consulted with her attorney at the police station at about 5 o'clock in the afternoon on the day in question and after this consultation, and in the presence of the attorney, she stated that she had given the written statements and that they were true. In the light of all this, and giving full scope to the Miranda holding, it seems well-nigh incredible that such conduct on the part of the law enforcement officers could be held to be constitutionally evil.

But, quite as disturbing, is the contention, assuming a violation of Miranda, that such evidence is not admissible at a preliminary hearing to determine the issue of probable cause. Not only is a preliminary hearing not a trial, but our court and the federal courts have repeatedly held that under Nebraska law a preliminary hearing is not a critical stage of a criminal proceeding and that no constitutional rights are in jeopardy as a result thereof. Even the hallowed and undenied right to counsel or representation at a preliminary hearing is not required, and this is particularly true where, as here, the defend-

ant offered no testimony and made no admissions. State v. Sheldon, 179 Neb. 377, 138 N. W. 2d 428; Burnside v. State, 346 F. 2d 88; Ronzzo v. Sigler, 235 F. Supp. 839; Bird v. Sigler, 241 F. Supp. 1007; Pointer v. Texas, 380 U. S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923. It is difficult, if not inconceivable, to understand a contention that there is no constitutional requirement of counsel at a preliminary hearing, but yet that there is a constitutional requirement of counsel being present at the giving and taking of a voluntary statement prior thereto.

Behind the legal structure of this case lie the realities of necessities of law enforcement. It is one thing to say that when society apprehends an individual he must be promptly and perhaps immediately brought before a magistrate for a hearing. It is an entirely different thing to say that society at that time must, in effect, present, in full array, completely sufficient proof of the defendant's guilt beyond a reasonable doubt, with all of the technical and burdensome ramifications inherent in our adversary criminal trial procedures. Such a holding would inhibit, if not render useless, post-arrest investigation, and emasculate law enforcement, particularly as to those types of violent crimes where immediate apprehension and detention is imperative if society is to be protected.