STATE OF NEBRASKA, APPELLEE, V.
GARY M. BREHMER, APPELLANT.
317 N.W.2d 885

Filed March 26, 1982.   No. 44023.

Charles A. Fisher, David E. Veath, and Lynn B. Lamberty, for appellant.

Paul L. Douglas, Attorney General, and Bernard L. Packett, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

The defendant, Gary M. Brehmer, was convicted by a jury of the January 10, 1980, violation of Neb. Rev. Stat. § 28-517 (Reissue 1979), namely, the receiving, retaining, or disposing of stolen movable property of another, knowing or believing that it had been stolen, to wit, a 1979 Ford pickup truck valued in excess of $1,000. He was sentenced to a term of

probation of 3 years, which included imprisonment in the Sheridan County jail for a period of 30 days. On appeal, he has assigned as errors: (1) The improper joinder for trial with a codefendant charged in a separate information with the same offense as well as with an additional count; (2) The admission of certain hearsay evidence under the guise of impeachment; (3) The interrogation of a witness by the trial judge; (4) The overruling of his plea in abatement; (5) The giving of certain instructions; and (6) The insufficiency of the evidence to sustain the jury's verdict. We reverse and remand for a new trial.

Donald Schwarting, a partner of the defendant's in the ownership and operation of Pioneer Mobil station in White Clay, Nebraska, was charged in a separate information with the same crime as that alleged against the defendant, plus a second count of receiving, retaining, or disposing of a stolen 1976 Ford pickup truck, also on January 10, 1980. On motion of the county attorney, the two cases were joined for trial over the objections of both the defendant and Schwarting. Some 3 weeks before trial, motions to sever were argued and overruled.

The evidence adduced would support the following findings: On January 10, 1980, law enforcement officers were contacted by a Jack Jones, a former employee at the Pioneer Mobil station, which led the sheriff and a State Patrol investigator to walk by Schwarting's body shop in Rushville, Nebraska, to look for a stolen pickup truck. A green 1979 Ford pickup truck, matching the description of one stolen from Gordon, Nebraska, was observed inside the shop. On January 11, 1980, after obtaining permission and assistance from Schwarting, the officers entered the shop and identified the truck which had been reported stolen. A 1976 black Ford pickup truck was also observed inside the shop. Examination of the 1979 pickup revealed that the plate con-

taining the so-called public vehicle identification number, referred to as a VIN, was missing from the doorpost where it should be found. Therefore, it was necessary to secure this number from the frame where the same number was stamped. Use of this number allowed the officers to positively determine that the pickup was stolen. An examination of the black 1976 Ford truck disclosed that the public VIN plate on the doorjamb did not correspond with the number stamped on the frame. Further investigation disclosed that this truck had been reported stolen from a South Dakota dealership and that the identification number located on the doorjamb, as well as the license plates attached to the truck, had belonged to a wrecked 1976 red Ford pickup that had been purchased by Schwarting from an Ed Holderness.

According to the testimony of the officers, Schwarting told them that on December 29, 1979, he had been asked by a man by the name of Al to pick up this 1979 truck at a location near the moccasin factory in Pine Ridge, South Dakota, and haul it to Schwarting's body shop to do some work on it. The officers then stated that Schwarting had said that he had picked up the truck on either December 30 or 31, 1979, and that he was alone when he accomplished this. Schwarting, it is claimed, finally admitted that he thought the vehicle might have been stolen, but that he never raised any questions in that regard.

These same officers, Sheriff Talbot and Patrol Investigator Streeter, on January 11, 1980, then talked to the defendant Brehmer, after reading the *Miranda* rights and warnings to him. They said that Brehmer told him that, at Schwarting's request, he went with him to some place out in the country north of Pine Ridge and picked up this green truck which was sitting on its hubs on the ground out in some trees. He helped Schwarting load the truck onto a trailer which was returned to White Clay and parked

behind the filling station. At trial, Brehmer testi-
fied that he never saw the green truck again. He
also testified that this all happened on December 30,
1979.

The only direct evidence as to when and how
Schwarting came into possession of the 1976 black
pickup truck was provided by Schwarting himself.
According to Investigator Streeter, Schwarting told
him during the investigation that the truck belonged
to Ed Holderness and that he was to repair the rear
seals for him. However, Ed Holderness testified
that it was the wrecked 1976 red Ford pickup which
he in fact had owned and had sold to Schwarting.
This was the truck mentioned earlier in the opinion
which had carried the doorjamb serial number and
license plates which were later found to be attached
to the stolen black pickup. During the course of the
trial, Schwarting, apparently giving a different ver-
sion of the facts, testified that it was this same man,
called Al, who had asked him, Schwarting, to take
some dents out of the black truck, paint the top, and
repair some leaky rear wheel seals. Also, as re-
vealed by his testimony, this truck was left with
him, Schwarting, shortly before Thanksgiving of
1979, and he had retained it in his possession since
that time, but had not as yet completed the work on
it.

Jack Jones, the former Pioneer Mobil station em-
ployee, testified that Schwarting had told him that
the 1979 green pickup was a stolen vehicle. He also
claimed that after the truck had been brought to
White Clay he was in a conversation with both
Schwarting and the defendant in which Jones was
asked to store the truck in his barn, but he declined
because he did not want to be involved with a stolen
vehicle. He claimed that Brehmer then said that
the truck could be stored in his garage because no-
body would be looking for it out there. The only evi-
dence that in any way linked Brehmer with the

stolen 1976 black pickup, other than the fact that he was a partner of Schwarting's in the White Clay operation, was testimony to the effect that on one or more occasions in this period of time Brehmer had been in Schwarting's body shop. No other admissible evidence of a connection between the vehicle or the offenses was adduced at trial.

As noted, defendant's first assignment of error raises the question of the propriety of joining the defendant and Schwarting for trial. We cannot agree with the State's contention that this assignment of error was not properly raised in the motion for a new trial. Paragraph 9 of that motion is as follows: "The Court erred in giving instructions to the Jury as to both defendants and commingling same, in the instruction given, after request by each defendant, to have the instruction as to him given separately and distinctly from the other defendant, the cases having been consoldiated [sic] for trial over the objection of defendant, and Schwarting. Severance having been refused to the defendant Brehmer."

The matter of consolidating criminal prosecutions for the purpose of trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 1979). Section 29-2002(3) allows the joinder of defendants for trial "if . . . the defendants . . . could have been joined in a single indictment, information or complaint." The joinder of defendants in an indictment or information is governed by § 29-2002(2), which allows joinder if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This subsection goes on to note that all defendants need not be charged in each count of the indictment or information. Finally, once a case has been properly joined, a court may sever it for trial pursuant to § 29-2002(4), which provides: "If it appears that a defendant or the state would be prejudiced by a joinder of offenses or of defendants in an indictment,

information, or complaint, or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires."

In relation to these provisions it has been noted: "It is clear from the statute set out above that the matter of the propriety of a joint trial of criminal prosecutions involves basically two questions, that is, whether the *consolidation* was proper in that the defendants could have been joined in the same indictment, information, or complaint, and secondly, whether there was a right to *severance* because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial." (Emphasis in original.) *State v. Pope,* 192 Neb. 755, 765-66, 224 N.W.2d 521, 528 (1974).

This reasoning compels us to make the initial determination of whether Brehmer and the codefendant could have been joined in a single indictment or information in this instance pursuant to § 29-2002(2). Only in the event that such joinder was proper will it be necessary to determine whether the defendant was prejudiced by the joint trial and was thereby entitled to severance.

It is well settled that criminal actions "may be consolidated for trial if the offenses charged are based on the same act or transaction." *State v. Shiller,* 191 Neb. 291, 292, 214 N.W.2d 616, 617 (1974). See, *State v. Erving,* 180 Neb. 824, 146 N.W.2d 216 (1966); *State v. Pope, supra; State v. Saltzman,* 194 Neb. 525, 233 N.W.2d 914 (1975); *State v. Edwards,* 197 Neb. 354, 248 N.W.2d 775 (1977). However, in none of these instances have we had the opportunity to promulgate a definition of the phrase "same act or transaction" as that phrase has been used in various cases and joinder statutes of Nebraska.

The State would have us believe that joinder for trial is proper so long as the separate offenses charged are "substantially similar in time, and nature." Such a standard fails to meet the express language of the joinder statute which requires the allegation of the *same* act or transaction." § 29-2002(2). As other courts have noted, this phrase "contemplates more than similar violations within a limited time period," *United States v. Stafford,* 382 F. Supp. 1401, 1403 (E.D. Pa. 1974), and "a mere showing that the events occurred at about the same time, or that the acts violated the same statutes, is not enough." *United States v. Satterfield,* 548 F.2d 1341, 1344 (9th Cir. 1977).

Numerous federal jurisdictions have been called upon to interpret the meaning of the phrase "same act or transaction" due to the inclusion of the phrase in the federal rules of joinder. While discussing an allegation of misjoinder of defendants under Rule 8(b) of the Federal Rules of Criminal Procedure, one court noted: "Where conduct upon which each of the counts is based is *part of a factually related transaction or series of events in which all defendants participated,* charges may be properly joined although various offenses were distinct and defendants were not charged on each count or guilty of the same offenses." (Emphasis supplied.) *United States v. Leach,* 429 F.2d 956, 960 (8th Cir. 1970). Another court noted: "Rule 8(b)'s 'goal of maximum trial convenience consistent with minimum prejudice' is best served by permitting initial joinder of charges against multiple defendants *whenever the common activity constitutes a substantial portion of the proof of the joined charges.*" (Emphasis supplied.) *United States v. Roselli,* 432 F.2d 879, 899 (9th Cir. 1970).

A test has also evolved in the Oregon courts, which have found that "the two charges arise out of the same act or transaction if they are so closely linked

in time, place and circumstance that a complete account of one charge cannot be related without relating details of the other charge." *State v. Fitzgerald,* 267 Or. 266, 273, 516 P.2d 1280, 1284 (1973). This test was later construed to permit joinder "only where the facts of *each* charge can be explained adequately only by drawing upon the facts of the other charge." (Emphasis in original.) *State v. Boyd,* 271 Or. 558, 566, 533 P.2d 795, 799 (1975).

It is readily apparent that, under any of these tests to determine whether the offenses arose out of the "same act or transaction or in the same series of acts or transactions," the facts in the present case do not support joinder of the defendants for trial. Substantially the same facts need not be adduced in order to prove each of the offenses since the only common facts involving both pickups are the involvement of the codefendant and the fact that the pickups were found in the same building. Similarly, this is not an instance where both offenses are part of a factually related transaction or series of events in which all defendants participated, since the record contains no admissible proof that the defendant assisted in receiving the 1976 black pickup or that he assisted in placing or retaining either pickup in the codefendant's body shop. Furthermore, it cannot be said that the common activity constituted a substantial portion of the proof of the joined charges in light of the fact that the only common activity of which there is evidence is the drive from White Clay to Pine Ridge to obtain the 1979 green pickup. No common activity was proven regarding the receipt of the black pickup or the retention of either pickup. Finally, this is not a case where the facts of one charge can only be adequately explained by drawing on the facts of the other charge. The only substantive evidence that was admissible against the defendant involved the 1979 green pickup only, with no mention of the 1976 black pickup necessary.

Therefore, we conclude that receipt or retention of the 1976 pickup was not a part of the same act or transaction or series of acts or transactions. The charges could not have been joined in the same information and, consequently, the defendants could not be joined for trial.

The question remains, however, whether, without a showing that the defendant was prejudiced thereby, such misjoinder is merely harmless error. It is a longstanding rule of this court that it will not reverse a criminal conviction in the absence of prejudice to the defendant. *State v. Kirby,* 198 Neb. 646, 254 N.W.2d 424 (1977). However, "[t]he error here was no mere technicality. The rule against jointly indicting and trying different defendants for unconnected offenses is a long-established procedural safeguard. . . . It is not 'harmless error' to violate a fundamental procedural rule designed to prevent 'mass trials.' " *Ingram v. United States,* 272 F.2d 567, 570-71 (4th Cir. 1959). "If multiple defendants are misjoined, the trial court has no discretion, since misjoinder is prejudicial per se." *Haggard v. United States,* 369 F.2d 968, 973 (8th Cir. 1966). See, also, 1 Wright, Federal Practice and Procedure § 144 at 328-29 (1969).

We also note that § 29-2002(3) clearly and expressly provides that a "court *may* order two or more indictments, informations, or complaints . . . to be tried together if the offense, and the defendants . . . could have been joined in a single indictment . . . ." (Emphasis supplied.) The natural inference to be drawn from this language is that a court *may not* consolidate defendants for trial if joinder of defendants is not allowed by § 29-2002(2). Should this court adopt a rule requiring proof of prejudice in spite of misjoinder under the statute, it would give rise to the danger that it would become accepted practice to join defendants as a matter of course, placing the burden on the joined defendants to show they are en-

titled to severance due to prejudice. Such a practice is not within the clearly expressed restrictions on joinder and will not be encouraged by this court.

Therefore, we conclude that in cases where multiple defendants are joined for trial in a manner inconsistent with § 29-2002, such misjoinder is prejudicial per se and severance is not a matter of discretion but is a matter of right. In light of this conclusion we are compelled to reverse defendant's conviction and remand the matter for retrial.

The fact that we are reversing this conviction makes it appropriate to discuss those assignments of error that are likely to occur again on retrial. One such assignment of error challenges the manner in which the State impeached one of its own witnesses by the production of extrinsic evidence of a prior inconsistent statement made by the witness.

During its case in chief the State called one Joe Bolek, Jr., to the stand. Mr. Bolek admitted to having visited with defendant Brehmer in late December 1979 in the codefendant's Rushville body shop. Bolek also testified that he saw a wrecked brown pickup in the body shop at the time, and that when he asked Brehmer what was to be done with the wreck, the latter responded that it was to be sold for parts. Thereafter, the prosecutor proceeded to ask a series of questions concerning whether Bolek had spoken to Brehmer about switching vehicle identification numbers of another pickup with that of the wrecked pickup and whether he, Bolek, had observed Brehmer working on the wrecked pickup's identification number. Mr. Bolek responded negatively to each of these questions.

Following this exchange the prosecutor set out to impeach Mr. Bolek by asking him about a conversation he had allegedly had with the authorities investigating the matter on or about January 11, 1980. After Bolek admitted talking to the sheriff and State Patrol investigator on that date, the prosecutor

asked the following questions: "[D]id you tell them that the defendant, Mr. Brehmer, was working on the VIN when you were at the body shop? . . . Did you tell them that you did not want to get involved in the switching of the VIN or the vehicle identification numbers? . . . Did you tell [them] that you did not believe the defendant, Mr. Brehmer, was kidding when he said that they were going to use the serial number off of the wrecked truck on another truck?" Upon the court's overruling of defense counsel's objections to these questions, Mr. Bolek flatly denied ever having made such statements to the sheriff and investigator.

Immediately thereafter, the State called the sheriff and the investigator to the stand. After establishing that each was present during the conversation with Mr. Bolek, the prosecutor asked the sheriff the following questions: "[D]id Mr. Bolek tell you that in late December of 1979 he saw Gary Brehmer working on a VIN number or serial number in Don's Body Shop? . . . Did Mr. Bolek tell you that Mr. Brehmer had told him that they were going to junk out a wrecked pickup and use the VIN or serial number for another pickup truck? . . . Did Mr. Bolek tell you that he left the shop . . . because he did not want to be involved in the switching of VINs or serial numbers? . . . Did Mr. Bolek tell you that he did not believe that Brehmer was kidding when he said that he was going to use the serial number off the wrecked pickup truck on another pickup?" Questions similar to these were asked the investigator in a like manner. Once again, the court overruled defense counsel's objections to these questions, based on relevancy and hearsay, and the officers were allowed to reply that Mr. Bolek had indeed made such statements to them on January 11, 1980.

The court did not admonish the jury at the time of the questioning as to the limited use of the officers'

testimony. In fact, defense counsel did not request such an admonishment. The court did, however, instruct the jury at the close of the case that it had heard testimony concerning certain prior statements of witnesses that were inconsistent with their testimony at trial. The jury was cautioned that such evidence was to be used as an aid in determining the witnesses' credibility and was not evidence of the facts declared in the statements.

The defendant challenges this method of impeachment as an attempt to offer inadmissible hearsay evidence as substantive evidence under the guise of impeachment. We have frequently recognized the general proposition that proof of contradictory statements of a witness may be received in evidence for the purpose of aiding the jury in estimating the credibility of the witness, but unless made as an admission by a party to the record, such statements may not be utilized as substantive evidence of the facts declared. *State v. Payne,* 205 Neb. 522, 289 N.W.2d 173 (1980); *Texter v. State,* 170 Neb. 426, 102 N.W.2d 655 (1960). It has yet to be determined, however, whether this general rule is applicable under the peculiar set of circumstances presented by the case at bar.

These peculiar circumstances include the fact that Mr. Bolek was the State's own witness, called during the State's case in chief. Furthermore, it is quite obvious that the prosecutor was well aware of an unwillingness on Mr. Bolek's part to testify in the case. This prior knowledge is evidenced by the prosecutor's questioning of Bolek concerning an alleged inquiry Bolek had made to the sheriff regarding the punishment for refusing to testify. The prosecutor also pointed out the fact that Mr. Bolek had allegedly refused to talk to him about the case.

We are well aware of the fact that one need no longer be "surprised" by the testimony of one's own witness in order to be allowed to impeach that wit-

ness. This rule was abandoned in *State v. Fronning,* 186 Neb. 463, 183 N.W.2d 920 (1971), and this abandonment was codified in Neb. Rev. Stat. § 27-607 (Reissue 1979). However, the abandonment of the "surprise" element of impeaching one's own witness does not require that this court condone the manner of impeachment utilized in this instance.

We believe that from those portions of the interrogation of the witness Bolek, set out above, the prosecutor had no reason to believe that he would get other than negative answers from the witness. Although the substance of the extrajudicial statements alleged to have been made by the witness were important elements of the prosecution's case, nevertheless, there was no affirmative damage done to that case by answers given at trial. "He [the prosecutor] may not claim affirmative damage from Mrs. Brisson's mere failure to testify favorably as he had hoped. *Absent affirmative damage,* impeachment was improper. A party 'is not permitted to get before the jury, under the guise of impeachment, an ex parte statement of [a] witness, by calling him to the stand when there is good reason to believe he will decline to testify as desired, and when in fact he only so declines.' " (Emphasis supplied.) *Bushaw v. United States,* 353 F.2d 477, 481 (9th Cir. 1965). To the same effect is *United States v. Cunningham,* 446 F.2d 194, 197 (2d Cir. 1971), wherein the court said: " '[t]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised,' and 'where the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment. * * *' " The most recent federal case on this point seems to be *United States v. Miller,* 664 F.2d 94 (5th Cir. 1981). Noting that Rule 607 of the Federal Rules of Evi-

dence permits the government to impeach its own witness by prior inconsistent statement, the court nevertheless said that it "may not use such a statement under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." (Emphasis in original.) *Id.* at 97. Finally, in *State v. Adams,* 355 Mo. 1186, 1195, 200 S.W.2d 75, 79 (1947), that court said: "A mere refusal to testify or testimony negative in nature indicating a lack of testimonial information does not present the grounds for impeaching the witness that affirmative testimony in favor of the opposite party gives for inquiry concerning prior statements contradictory of the testimony under oath at the trial."

Perhaps the case most nearly on point from this court is *State v. Isley,* 195 Neb. 539, 239 N.W.2d 262 (1976). In that case, the witness Slankard was called by the defendant, who was charged with manslaughter, and testified that he was not at the Sahara Lounge at the time of the fatal attack on the victim. Cathy Tucker was then called to offer impeachment testimony. She stated that Slankard had told her that he was at the scene at the time of the incident. Further testimony was objected to by the prosecutor and sustained by the District Court. The defense made an offer of proof to the effect that, if allowed to testify, Cathy Tucker would testify that Slankard had told her that he witnessed the assault and that the defendant was not one of the assailants. In affirming the action of the trial court, we said: "Slankard was impeached as to all the direct testimony he gave when Cathy Tucker testified he told her (at a subsequent time) that he was in the Sahara Lounge parking lot at the time of the incident. Slankard's testimony that he was not there was therefore impeached. The only possible result in admitting *further* Tucker hearsay testimony as to what Slankard told her would be to influence the

jury as to the truth of the facts 'believed' to be present in the offer of proof as to Tucker's testimony." (Emphasis in original.) *Id.* at 543, 239 N.W.2d at 265.

We believe that the following syllabus point from *Wilson v. State,* 170 Neb. 494, 103 N.W.2d 258 (1960), is applicable here: "The rule allowing a party to impeach his own witness may not be used as an artifice by which inadmissible matter may be gotten to the jury through the device of offering a witness whose testimony is or should be known to be adverse in order, under the name of impeachment, to get before the jury for its consideration a favorable ex parte statement the witness had made."

The defendant also challenges the propriety of the trial court's interrogation of a witness from the bench during the trial. In regard to this assignment of error, we note that the judge may interrogate witnesses, whether called by himself or by a party. Neb. Rev. Stat. § 27-614(2) (Reissue 1979). " 'However this right "* * * should be very sparingly exercised, and generally counsel for the parties should be relied on and allowed to manage and bring out their own case. The actions of the judge in this respect should never be such as to warrant any assertion that they were with a view to assistance of the one or the other party to the cause." ' " *Foremost Ins. Co. v. Allied Financial Services, Inc.,* 205 Neb. 153, 162-63, 286 N.W.2d 740, 746 (1980).

In this instance the question from the bench was directed to the owner of the 1976 black pickup and concerned the witness' valuation of that pickup. The defendant was not charged with any offense relating to this pickup and, therefore, any error committed by the court in this instance would not have prejudiced the defendant's rights. "The only errors which require reversal of a cause are those prejudicial to the right of the accused, or which constitute the denial of a substantial legal right." *State v.*

*Packett,* 206 Neb. 548, 552, 294 N.W.2d 605, 608 (1980). The court's action, standing alone, would not require reversal of the defendant's conviction.

Defendant's objection to the instructions related only to the court's having failed to give them separately as to the defendant and his codefendant Schwarting. Inasmuch as we have concluded that the two defendants were joined improperly for trial, we need not address that alleged error, other than to state that in a proper case we do not believe that it is necessary to give two complete sets of separate instructions.

The final assignments of error challenge the overruling of the defendant's plea in abatement and the insufficiency of the evidence to sustain a verdict of guilty. We can consider these together.

While the general rule is that any error by the District Court in ruling on a plea in abatement is cured by a subsequent finding by the jury of guilt beyond a reasonable doubt, *State v. Franklin,* 194 Neb. 630, 234 N.W.2d 610 (1975), the rule is inapplicable in this instance. That is because, of course, we have ordered the conviction set aside and remanded the case for a new trial.

In order to resist a challenge by a plea in abatement, the evidence received by the committing magistrate need only show that a crime was committed and that there is probable cause to believe that the accused committed it. The evidence need not be sufficient to sustain a verdict of guilty beyond a reasonable doubt. *Delay v. Brainard,* 182 Neb. 509, 156 N.W.2d 14 (1968). We have examined the record made at the preliminary hearing, as well as that of the trial itself, portions of which have been set forth in this opinion. We believe that each record, respectively, sustains a finding of probable cause and, except for the aforementioned prejudicial error, would support a finding of guilt beyond a reasonable doubt as well.

For the reasons given, the judgment and sentence of the District Court are reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

BRODKEY, J., concurs in the result.