PEOPLE *v.* OGG

OPINION OF THE COURT

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—PROBABLE CAUSE—
   DISCRETION.

   A finding of probable cause at preliminary examination does
   not require that the guilt of defendant be established beyond
   a reasonable doubt, and an appellate court will not substitute
   its judgment for that of the examining magistrate unless there
   has been a clear abuse of discretion.

2. STATUTES—CONSTRUCTION—IN PARI MATERIA.

   A statute making it a misdemeanor to encourage or contribute
   toward a minor child becoming neglected or delinquent or
   coming under the jurisdiction of the juvenile division of the
   probate court must be construed as being *in pari materia*
   with a statute defining the jurisdiction of the juvenile division
   of the probate court (MCLA §§ 712A.2, 750.145).

3. HOMICIDE—INVOLUNTARY MANSLAUGHTER—NEGLIGENCE—NEGLECT
   OF DUTY—OMISSIONS.

   Conviction of involuntary manslaughter may be predicated upon
   an omission to perform a legal duty, when the omission is
   gross or culpable, as where a defendant had confined her
   retarded child to a small room without windows, and without
   anyone present in the house to release the child in case of
   emergency, and a fire caused the child's death during the
   confinement.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 450.
[2] 41 Am Jur 2d, Juvenile Courts and Delinquent and Dependent
    Children § 12.
[3–8] 40 Am Jur 2d, Homicide § 70.
[4] 5 Am Jur 2d, Appeal and Error § 783.
[6] 39 Am Jur, Parent and Child § 89 *et seq.*

4. APPEAL AND ERROR—MISCARRIAGE OF JUSTICE.

The Court of Appeals will not reverse a criminal conviction unless it is satisfied that there was error committed which has resulted in a miscarriage of justice.

Dissenting Opinion
Danhof, J.

5. STATUTES—CONSTRUCTION—CHILD CRUELTY.

*The statute punishing cruelty to a child proscribes only* habitually *causing or permitting the health of the child to be injured or his life endangered, thereby restricting the applicability of the statute to cases where a child's health is injured by repeated beatings or his life is endangered by lack of shelter or food or by other injury to his body.*

6. EVIDENCE—INVOLUNTARY MANSLAUGHTER—PURPOSE—CONDITIONS —RELEVANCY.

*Evidence of defendant mother's purpose in leaving her house and evidence of the conditions inside the room in which children were confined while she was gone is irrelevant in a trial of the parent for manslaughter after a fire caused the death of the children during their confinement.*

7. HOMICIDE—INVOLUNTARY MANSLAUGHTER—PROXIMATE CAUSE— FORESEEABILITY—INTERVENING CAUSE.

*A parent's confinement of a child to the child's room during the parent's absence from the house is not the proximate cause of the death of the child where it was not reasonably foreseeable that a fire would cause the death of the child during the parent's absence.*

Appeal from Kent, Claude Vander Ploeg, J.   Submitted Division 3 February 4, 1970, at Grand Rapids. (Docket No. 3,903.)   Decided September 2, 1970.

Irene Phyllis Ogg was convicted of manslaughter. Defendant appeals.   Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,*

Prosecuting Attorney, and *Wesley J. Nykamp,* Chief Appellate Attorney, for the people.

*Clifford J. Murphy,* for defendant on appeal.

Before: Holbrook, P. J., and Danhof and Rood,* JJ.

Holbrook, P. J. On the morning of November 4, 1966, following a fire of undetermined cause at the family residence in the city of Wyoming, Kent county, Michigan, two small children, William Ogg, Jr., age 5, and his brother, Philip Ogg, age 4, sons of defendant, Irene Phyllis Ogg and her husband, William Wayne Ogg, were found dead by firemen in an upstairs room. The children had been left unattended and locked in their sleeping quarters on that fateful morning and died from the inhalation of carbon monoxide fumes. Defendant was convicted of involuntary manslaughter in the death of William Ogg, Jr., and sentenced to a term of 3 to 15 years in the Detroit House of Correction, a sentence she is presently serving. CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553).

On the evening prior to the fire, both defendant and her husband went away in the early evening. William Ogg, a vacuum cleaner salesman, went to his office and returned sometime after midnight, while defendant departed to conduct a sales demonstration party away from home, leaving William Ogg, Jr., and Philip Ogg in the charge of the two older children, Melvin Ogg, age 6, and Richard Jensen, age 10, the latter being defendant's child by a former marriage. Defendant left the house between 7 and 7:30 p.m., returning shortly before midnight. Prior to leaving the house, defendant instructed

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Richard that he could lock the younger children
in their room in the event that they gave him any
trouble. The procedure used in the Ogg household
for this purpose was that of "knifing the door," by
wedging a knife between the door and the casing
in such a way as to prevent opening of the door.

During the evening Richard sent the two younger
boys to bed and because William, Jr., and Philip
were running around upstairs, Melvin, apparently
at Richard's request, knifed the door in order to
confine the two young boys to their room.

When defendant returned home the house was
quiet and she did not check on the four children,
all of whom slept upstairs, before retiring to her
first-floor bedroom for the night. She did not know
that the door to the room occupied by William, Jr.,
and Philip was locked, although, as she testified,
she was assured in her own mind that it was, inas-
much as it was a matter of course that Richard
would lock that door if he were going to bed in the
upstairs room shared with brother Melvin, before
the arrival home of his mother. Defendant's hus-
band, who apparently had seldom seen the upstairs
of his home in the family's approximately two years
of residence there and, as he testified, had never
been in certain of the upstairs rooms, likewise did
not check on the children after arriving home that
evening.

On the morning of November 4, 1966, the older
brothers, Melvin Ogg and Richard Jensen, got up,
ate breakfast, and went to school. It was unclear
from the testimony whether William, Jr., and Philip
Ogg were released from their room for breakfast.
In any event, defendant testified that she did not
know, of her own knowledge, whether William, Jr.,
and Philip were brought downstairs for breakfast.
Neither she nor her husband, both of whom got up

after the older children had departed for school, made any attempt to see the boys or locate them in the morning, but defendant was assured, as she testified, that they were locked into their upstairs room. Defendant's husband testified that he left the house for work at approximately 9 a.m. without knowledge that defendant had plans that morning to be gone from the house. Defendant finished dressing about 9:30 a.m., had a cup of coffee, went to the stairway and listened to see if she could hear the young boys upstairs and, hearing nothing, walked out the front door between 9:30 and 10 a.m. Defendant testified that she went to a training class for sales people until about 12 or 12:30 that afternoon, after which she had lunch at a restaurant and conversed for a while, and then bought two snow shovels and departed for home at approximately 1:10 p.m.

In the meantime, a neighbor reported the fire at the Ogg house at 11:37 a.m. and firemen were at the scene at approximately 11:39 a.m. The bodies of William Ogg, Jr., and Philip Ogg were found by firemen in their upstairs room upon entry into the house 15 to 20 minutes after arriving on the scene. One body was found lying on the bed, the other on the floor, and both were clothed only in undershorts. Attempts to revive the young boys were unsuccessful.

Testimony of a certified consulting psychologist who had examined William Ogg, Jr., when he was two years of age revealed that he was a boy of educably retarded intellectual functioning, who had a tendency to be dependent upon other people and who reacted poorly to frustration.

Testimony showed that both children were, at the time of the fatal fire, occupying as their sleeping quarters a small room with sloping ceiling, with an

area approximately 6 feet by 11 feet on the upstairs floor, without windows and which, at the time firemen discovered the bodies of the two boys, contained piles of human excrement. There was testimony that there was no bedding on the rollaway bed located in that room, and that the room was without heat. It also appears from the evidence that the room had an electrical fixture without a functioning bulb. It had been decided by defendant and her husband several months prior to the fire that William, Jr., and Philip should be placed in the windowless room, which had a door which could be secured, so as to try to curb such tendencies of the young boys as that of setting fires in the upstairs portion of the house as well as attempting to climb out of certain of the upstairs windows.

Defendant was arrested on November 16, 1966, and charged with manslaughter in the death of William Ogg, Jr. A preliminary examination was held on December 15 and 16, 1966, resulting in a finding by the examining magistrate that there was probable cause to believe that the offenses of involuntary manslaughter and cruelty to a minor child had been committed by defendant. At the arraignment defendant stood mute and a plea of not guilty was entered as to both counts. A nonjury trial began in the Kent County Circuit Court on April 17, 1967, at the conclusion of which defendant was found guilty of involuntary manslaughter.

The issues raised by defendant on this appeal are restated and considered as follows:

(1) *Did the examining magistrate commit error in finding that a crime had been committed and that there was probable cause to believe that the accused was guilty of that crime?*

Defendant contends that, upon the basis of the transcript of proceedings had before the examining

magistrate, the prosecution failed to establish that a crime had been committed or that defendant committed it.

The people counter by asserting that in order to establish error by the examining magistrate in binding a defendant over for trial, defendant has the burden of establishing a clear abuse of discretion; that absent a clear abuse of discretion an appellate court will not disturb the findings of the magistrate, *People* v. *Dellabonda* (1933), 265 Mich 486; and that no such abuse of discretion has been alleged or shown by defendant.

Evidence as to the circumstances surrounding the tragic events of November 4, 1966, as elicited at the preliminary examination, was substantially the same as that produced upon the trial of this cause, resulting in a finding of defendant's guilt beyond a reasonable doubt. The opinion of the examining magistrate stated in part:

" * * * pursuant to the statutes in such case made and provided, that upon the conclusion of the examination the said Irene Phyllis Ogg as aforesaid, I found that there was * * * probable cause to believe that the offense of involuntary manslaughter and cruelty to a minor child has been committed by her and that the specification of said offenses and particulars thereof are as follows, to-wit:

"Upon the 4th day of November, 1966, at the City of Wyoming, County and State aforesaid, one Irene Phyllis Ogg, being the mother of William Ogg, of the age of five years, and under whose protection and custody said child was, did commit the crime of involuntary manslaughter, contrary to Section 28.553 of Michigan Statutes Annotated, as amended,[1] in the death of William Ogg, to-wit:

"That the respondent had certain legal and lawful duties imposed upon her in the care and custody

---

[1] CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553).

of said child, to-wit: to refrain from cruel and unlawful punishment, to provide proper food, clothing and shelter, or to provide such care that the health of said child was not impaired or injured, the said duties being imposed upon the respondent by virtue of Section 28.331 of Michigan Statutes Annotated, as amended,[2]

"That the respondent did grossly, wilfully, wantonly and negligently breach the aforesaid legal duties and violate the aforementioned Section 28.331 of Michigan Statutes Annotated, as amended, to-wit: that the respondent, being the mother of said child and having the custody of said child, caused the said child to be left unattended in the home, placed in an upstairs closet, the door of which was secured by a knife, and said closet being without proper heat, lights, food, clothing or bedding, and without means of escape, wherein a fire resulted in the home, and due to the aforesaid breach of legal duties, the death of William Ogg resulted.

"That the respondent had certain legal and lawful duties imposed upon her in the care and custody of said child, to-wit: to prevent said William Ogg from becoming neglected so as to come under the jurisdiction of the Juvenile Division of the Probate Court; said duties being imposed upon respondent by virtue of Sections 28.340[3] and 27.3178 (598.2) b (1)[4] of Michigan Statutes Annotated, as amended, * * * ."

A finding of probable cause at a preliminary examination does not require that the guilt of a defendant be established beyond a reasonable doubt. *People* v. *Ray* (1966), 2 Mich App 623. This Court may not substitute its judgment for that of the magistrate unless there has been a clear abuse of discretion in his determination of probable cause. *People* v. *Dellabonda, supra; People* v. *Davis* (1955),

---

[2] CLS 1961, § 750.136 (Stat Ann 1962 Rev § 28.331).
[3] CL 1948, § 750.145 (Stat Ann 1962 Rev § 28.340).
[4] MCLA § 712A.2 (Stat Ann 1970 Cum Supp § 27.3178[598.2]).

343 Mich 348; *People* v. *Marklein* (1960), 358 Mich
471; *People* v. *O'Leary* (1967), 6 Mich App 115, 120.
No such abuse has been alleged or shown. This
Court is of the opinion that, upon a thorough review
of the record of the proceedings had before the
examining magistrate, the evidence was sufficient to
uphold the magistrate's action in binding the defend-
ant over for trial in circuit court.

(2) *Was there sufficient evidence presented upon
the trial which, if believed by the trier of the facts,
would justify finding defendant guilty beyond a rea-
sonable doubt?*

It is the contention of defendant that there was
no evidence in this case that the defendant's act of
absenting herself from the family home on the morn-
ing of November 4, 1966, leaving her two young
boys unsupervised during her absence, was the prox-
imate cause of their deaths or that the deaths were
foreseeable, citing 40 CJS, Homicide, § 57, which
states in part at pp 921, 922:

"There must be such legal relation between the
commission of the unlawful act and the homicide
that it logically follows that the homicide occurred
as a part of the perpetration of, or attempt to com-
mit, the unlawful act. Thus the death must be due
to the unlawful act of accused and not to the inter-
vening act or negligence of a third person, or to an
independent intervening cause in which accused did
not participate and which he could not foresee; and
the death must have been the natural and probable
consequence of the unlawful act, and the act the
proximate cause."

Defendant, in addition, cites other authorities in sup-
port of the contention that, in an involuntary man-
slaughter case, the element of proximate cause must
be shown.

The people assert that where a death follows from the negligent or criminal omission to perform a legal duty, the person upon whom the legal duty is imposed is guilty of involuntary manslaughter, citing *People* v. *Ryczek* (1923), 224 Mich 106; and that, in the case at hand, defendant had a legal duty to protect and care for her children, a duty which she violated.

*People* v. *Ryczek, supra,* sets forth the definition of involuntary manslaughter at p 110, quoting from 21 Cyc, p 760, as follows:

" 'Involuntary manslaughter is the killing of another without malice and unintentionally, but *in doing some unlawful act not amounting to a felony* nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or *by the negligent omission to perform a legal duty.' "*   (Emphasis supplied.)

The duty of a parent to provide necessary care for a child's health and well-being, which defendant was lawfully obliged to perform, the negligent omission in the performance of which properly gives rise to a charge of involuntary manslaughter under the *Ryczek* definition where death ensues, is set forth in MCLA § 712A.2 (Stat Ann 1970 Cum Supp § 27.3178[598.2]) as follows:

"Sec. 2.   Except as provided herein, the juvenile division of the probate court shall have:
        *       *       *
"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county
"(1) *Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide* proper or necessary support,   *   *   * or other *care necessary for his health, morals or well-being,* or who is abandoned by his parents, guardian or

other custodian, *or who is otherwise without proper custody or guardianship;*   *   *   *   ." (Emphasis supplied.)

In 40 CJS, Homicide, § 63, p 929 it is stated:

"A charge of manslaughter may be predicated on a failure to act as well as on an act.   *   *   *   The omission must have been due to gross or culpable negligence, and must have been the proximate cause of the death; and the death must have resulted from the neglect of a plain legal duty imposed by law or contract on accused personally,   *   *   *   .

"   *   *   *   The rule that it may be manslaughter to omit to perform a legal duty has frequently been applied in cases of failure on the part of parents or others charged with the custody and care of children or other helpless and dependent persons to provide shelter, food, or medical attendance and in other like cases of neglect. To render accused guilty in such a case, he must have been under a legal duty imposed either by law or contract to care for deceased,   *   *   *   ."

See *People* v. *Beardsley* (1907), 150 Mich 206, 209.

To be read *in pari materia* with the above quoted statute is CL 1948, § 750.145 (Stat Ann 1962 Rev § 28.340) which provides in part:

"Any person who shall by any act, or by any word, encourage, contribute toward, cause or tend to cause any minor child under the age of 17 years to become neglected or delinquent so as to come or tend to come under the jurisdiction of the juvenile division of the probate court, as defined in section 2 of chapter 12a of Act No 288 of the Public Acts of 1939,   *   *   *   whether or not such child shall in fact be adjudicated a ward of the probate court, shall be guilty of a misdemeanor."

Failure to comply with the above statute constitutes the commission of an unlawful act which, where death ensues therefrom, likewise constitutes invol-

untary manslaughter pursuant to the *Ryczek* definition.

The acts of defendant in placing her children, or allowing them with her knowledge to be locked, in a small windowless upstairs room, without proper heat, light, food, clothing or bedding, and without means of escape, and, in reckless disregard of the consequences of such action, absenting herself from the home in pursuit of her own business, constitutes, in our opinion, culpable negligence. Defendant's action also constitutes a misdemeanor in child neglect, in that defendant clearly failed to provide care necessary for their health and well-being, thereby causing them to be neglected, within the meaning of the above-quoted statutes. Defendant left the children unattended, without having made any effort to determine their physical condition since the day prior to the tragic fire which claimed their lives while they were without supervision and care.

There was evidence that William Ogg, Jr. was not normal but, rather, was a retarded child. This, in itself, would appear to justify a finding that he was not capable of taking care of himself, and that defendant was culpably negligent in not caring for him and in leaving him and his young brother unattended during her prolonged absence from home. In addition there was opinion testimony from a detective with the Michigan State Police, assigned to the Fire Bureau, and from the city of Wyoming fire chief, who had been in the fire-fighting field for 30 years, and both of whom were present at the Ogg residence on the day of the fire, that evacuation of the children from the home would have been possible had the children not been confined to a small upstairs room while unsupervised.

The case of *Delay* v. *Brainard* (1968), 182 Neb 509 (156 NW2d 14), involving a review of a pro-

ceeding for a writ of habeas corpus by relator, who
was charged with manslaughter, is relevant to the
case at hand in the basic facts and holding, as set
forth in the prevailing opinion, with which we agree.
The Nebraska Supreme Court held that evidence
that the mother had locked her three children under
four years of age in the house and left on her own
pleasure in the morning, whereupon she was un-
available from before 9 a.m. until located at a bar
at 10:25 a.m., that a fire alarm was turned in at
9:45 a.m., and that one young child was found dead
in the house, was sufficient to allow a jury to deter-
mine whether, under the Nebraska statute which is
similar to the statute involved in this case,[5] the
conduct of relator constituted a breach of duty such
as to render her criminally negligent.  The Court
stated as follows at pp 513, 514:

"This raises the question then whether or not,
assuming the evidence to be true, it constitutes a
crime.   *   *   *

"Section 38–116, R. R. S. 1943, provides:

" 'It shall be unlawful, and it is hereby declared
to be cruelty for any person employing or having
the care, custody or control of any child, willfully
or negligently to cause or permit the life of such
child to be endangered, or the health of such child
to be injured, or willfully to cause or permit such
child to be placed in such a situation that its life or
health may be endangered,   *   *   *   .'

"  *   *   *   *   It must be conceded that the children
were incapable of taking care of themselves.  Re-
lator was courting trouble.  The law holds one so
situated that his act may endanger the life of another
to a high degree of caution, and he may be criminally
responsible for loss of life consequent on his failure

---

[5] MCLA § 712A.2 (Stat Ann 1970 Cum Supp § 27.3178[598.2]),
quoted in this opinion: failure to give "care necessary for his health,
morals or well-being" includes placing a helpless child in such a
situation that its life or health may be endangered.

to exercise a proper degree of caution. When we apply the test of the reasonable man, *we are forced to the conclusion that relator was deliberately jeopardizing the lives and safety of the children.* She had a legal duty to see that they were protected, but left them unattended for long periods of time. *Such neglect is criminal in its character and where it results in death will sustain a conviction for manslaughter.* The negligence on which a charge of involuntary manslaughter is predicated may be the omission of an act which it is a person's duty to perform. 1 Wharton's Criminal Law and Procedure, § 296, p 621.

\* \* \*

"The degree of negligence which will make one criminally responsible for a neglect of duty is difficult to define. Obviously, it is not any slight breach of duty but rather a gross failure to do what is required of one. On the record herein, we cannot say as a matter of law relator could not be guilty of manslaughter. Culpable neglect in omitting to perform a legal duty will sustain a manslaughter conviction. *Relator had a legal duty to protect the children. She deliberately locked them in the house alone while she went off to pursue her own pleasures. As a result, one of them was burned to death.*" (Emphasis supplied.)

As the people contend, the Nebraska Court in *Delay, supra,* was dealing with a factual situation which might well be considered less extreme than the situation presented by the instant case. Unlike the case at hand, in *Delay* the children were confined, not to a single windowless room upstairs, but, rather, to the house itself, affording them a greater possibility of escape or rescue, in case of emergency. Yet, the Court was of the opinion that there was probable cause to believe that the death of the child ensued from defendant's wrongful act, thus constituting manslaughter.

We cannot say that the death of William Ogg, Jr., did not result from defendant's failure to adequately supervise and care for his safety and that of his brother, or that her action was not culpably negligent. The evidence would appear, on the contrary, to support the opposite conclusion.

In *People* v. *Barnes* (1914), 182 Mich 179, 198, 199, the Court stated:

" * * * The crime sought to be proven was involuntary homicide, caused by culpable negligence, and, to make an act carelessly performed resulting in death a criminal one, the carelessness must have been gross, implying an indifference to consequences; and the term 'gross negligence' means something more than mere negligence. It means wantonness and disregard of the consequences which may ensue, and indifference to the rights of others that is equivalent to a criminal intent.

" * * * To warrant conviction, it must be gross negligence. It has been well said that there is little distinction, except in degree, between a will to do a wrongful thing and an indifference whether it be done or not. Therefore gross negligence is criminal, and within limits supplies the place of affirmative criminal intent.

" * * * As in the law of civil wrongs, so in the criminal law, *to render one answerable for an offense, it must result from his act as an effect not too remote but sufficiently proximate thereto.*

"To warrant a conviction of manslaughter, the conduct of the accused must have been the proximate cause of death, and must have been characterized by such a degree of culpable negligence as to amount to gross negligence; and that is a question for the jury." (Emphasis supplied.)

On appeal this Court will not reverse a criminal conviction unless we are satisfied that there was error committed which resulted in a miscarriage of

justice. *People* v. *Amos* (1968), 10 Mich App 533; *People* v. *Reed* (1969), 17 Mich App 696. We do not find such error here. There was sufficient evidence presented which, if believed by the trier of the facts, would justify the finding of defendant guilty of involuntary manslaughter beyond a reasonable doubt. The conviction of defendant was not clearly erroneous. *People* v. *Hawk* (1970), 22 Mich App 337.

Defendant contends that the trial court committed error in permitting defendant's husband to testify on behalf of the prosecution. In this case it was proper for defendant's husband to testify. CLS 1961, § 600.2162 (Stat Ann 1962 Rev § 27A.2162) provides in part:

"A husband shall not be examined as a witness for or against his wife without her consent; nor a wife for or against her husband without his consent, except in suits for divorce and in cases of prosecution for bigamy, in cases or prosecution for a crime committed against the children of either or both, and where the cause of action grows out of a personal wrong or injury done by one to the other, or grows out of the refusal or neglect to furnish the wife or children with suitable support, and except in cases of desertion or abandonment."

Affirmed.

Rood, J., concurred.

Danhof, J., (*dissenting*). On appeal defendant's counsel presents three issues. The second one is whether the facts as developed at the trial show as a matter of law that the crime of manslaughter was committed. My decision that the answer to this must be "no" makes it unnecessary to discuss the other two issues.

A fire occurred at the Ogg residence in Wyoming, Michigan on November 4, 1966. A neighbor reported it to the city fire department at 11:37 a.m. The only people in the house at the time were two of defendant's children, William Ogg, Jr., age 5, and Philip Ogg, age 4. They were dead when removed from an upstairs room by firemen. The pathologist testified that their deaths were caused by carbon monoxide poisoning.

On the evening prior to the fire, Mrs. Ogg left the home between 7 and 7:30 p.m. to conduct a sales demonstration and returned home shortly before midnight. Mr. Ogg, a vacuum cleaner salesman, went to his office and returned home after midnight. William, Jr., and Philip were left under the care of defendant's older children, Melvin Ogg, age 6, and Richard Jensen, age 10, the latter being defendant's son by a former marriage. Some time during the evening Richard sent William, Jr., and Philip to bed. When they would not stay in their room he told Melvin to lock the door. This was done by inserting a knife between the casing and the door. Fastening the door in this way had been a customary procedure in the family, known as "knifing the door," since the hook and eye lock on the door had been broken. Defendant had told Richard to "knife the door" if the two younger boys gave him any trouble. Neither defendant nor her husband checked on the children when they returned home. All four children slept upstairs and defendant and her husband slept on the first floor of the house.

The morning of the fatal day Richard and Melvin got themselves up, dressed, ate breakfast, and went to school. The testimony is varied as to whether William, Jr., and Philip were let out of their room for breakfast. If they were, they were returned to it by Melvin and the door again secured by a knife

as before.  After Richard and Melvin left for school,
Mr. and Mrs. Ogg got up and dressed.  Defendant's
husband testified that he left for work about 9 a.m.
A neighbor saw the defendant leave home between
9:30 and 10 a.m.  Neither Mr. nor Mrs. Ogg went
upstairs to check on the children before leaving the
house that morning.  Defendant testified that she
went to a training class for sales people and then
went for lunch with some of them, after which she
bought two snow shovels at a store and left for home
about 1 p.m.

On November 16, 1966, defendant was arrested
and charged with manslaughter.  A preliminary
examination was held on December 15 and 16, 1966,
at the conclusion of which the municipal judge
found that there was not probable cause to believe
that voluntary manslaughter had been committed by
defendant, and that there was probable cause to
believe that involuntary manslaughter and cruelty
to a minor child had been committed by the defend-
ant.  The municipal judge's written opinion states
in part:

"Upon the 4th day of November, 1966, at the City
of Wyoming, County and State aforesaid, one Irene
Phyllis Ogg, being the mother of William Ogg, of
the age of five years, and under whose protection
and custody said child was, did commit the crime
of involuntary manslaughter, contrary to Section
28.553 of Michigan Statutes Annotated, as amended,
in the death of William Ogg, to-wit:

"That the respondent had certain legal and law-
ful duties imposed upon her in the care and custody
of said child, to-wit:  to refrain from cruel and un-
lawful punishment, to provide proper food, clothing
and shelter, or to provide such care that the health
of said child was not impaired or injured, the said
duties being imposed upon the respondent by virtue

of Section 28.331 of Michigan Statutes Annotated, as amended,

"That the respondent did grossly, wilfully, wantonly and negligently breach the aforesaid legal duties and violate the aforementioned Section 28.331 of Michigan Statutes Annotated, as amended, to-wit: that the respondent, being the mother of said child and having the custody of said child, caused the child to be left unattended in the home, placed in an upstairs closet, the door of which was secured by a knife, and said closet being without proper heat, lights, food, clothing or bedding, and without means of escape, wherein a fire resulted in the home, and due to the aforesaid breach of legal duties, the death of William Ogg resulted.

"That the respondent had certain legal and lawful duties imposed upon her in the care and custody of said child, to-wit: to prevent said William Ogg from becoming neglected so as to come under the jurisdiction of the Juvenile Division of the Probate Court; said duties being imposed upon respondent by virtue of Sections 28.340 and 27.3178 (598.2) b (1) of Michigan Statutes Annotated, as amended.

"That the respondent did grossly, wilfully, wantonly and negligently breach the aforesaid legal duties and violate the aforementioned Section 28.331 of Michigan Statutes Annotated, as amended, to-wit: that the respondent, being the mother of said child and having the custody of said child, caused the said child to be left unattended in the home, placed in an upstairs closet, the door of which was secured by a knife, and said closet being without proper heat, lights, food, clothing or bedding, and without means of escape, wherein a fire resulted in the home, and due to the aforesaid breach of legal duties, the death of William Ogg resulted.

"Wherefore, Irene Phyllis Ogg did kill William Ogg, age five years, in violation of Section 28.553 of Michigan Statutes Annotated, as amended, and

against the peace and dignity of the people of the State of Michigan.

"Upon the 4th day of November, 1966, at the City of Wyoming, County and State aforesaid, one Irene Phyllis Ogg, being the mother of William Ogg, of the age of five years, and under whose protection, care and custody said child was, did cruelly, unlawfully and feloniously punish said child; did unlawfully or negligently deprive said child of necessary food, clothing or shelter and did wilfully cause or permit the health of such child to be injured, his life to be endangered by exposure, want or other injury to his person, in violations of and contrary to the provisions of Section 28.331 of Michigan Statutes Annotated, as amended."

The amended and supplemental information charged defendant in almost identical language to that just quoted from the examining magistrate's opinion. At the arraignment, February 24, 1967, defendant stood mute and a plea of not guilty was entered as to both counts, involuntary manslaughter under CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553) and child cruelty under MCLA § 750.136 (Stat Ann 1962 Rev § 28.331).

The nonjury trial commenced on April 17, 1967 and lasted nine days at the conclusion of which defendant was found guilty of involuntary manslaughter.

In *People* v. *Ryczek* (1923), 224 Mich 106, 110, our Supreme Court quoted with approval the following definition of involuntary manslaughter from 21 Cyc p 760:

"Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in

itself, or by the negligent omission to perform a legal duty."

The prosecution based its case on the last situation, negligent omission to perform a legal duty. The people argued that the child cruelty statute, MCLA § 750.136 (Stat Ann 1962 Rev § 28.331), imposed a legal duty on defendant, and that her negligent omission to perform it resulted in the death of William Ogg, Jr. The statute states:

"Any parent or guardian or person under whose protection any child may be, who cruelly or unlawfully punishes, or wilfully, unlawfully or negligently deprives of necessary food, clothing or shelter, or who wilfully abandons a child under 16 years of age, *or who habitually causes or permits the health of such child to be injured, his or her life endangered by exposure, want or other injury to his or her person,* or causes or permits him or her to engage in any occupation that will be likely to endanger his or her health, or deprave his or her morals or who habitually permits him or her to frequent public places for the purpose of begging or receiving alms, or to frequent the company of or consort with reputed thieves or prostitutes, or by vicious training depraves the morals of such child, shall, upon conviction, be deemed guilty of a felony: Provided, however, If, after such conviction and before sentence, in case the child has not been deformed or maimed, he or she shall appear before the clerk of the court in which said conviction shall have taken place, and with good and sufficient surety, to be approved by said clerk enter into bond to the people of the state of Michigan in the penal sum of $1,000.00 conditioned that he or she will furnish such child or children with necessary and proper home, care, food, shelter, protection and clothing, the said court may suspend sentence therein. When complaint is made on oath or affirmation to a magistrate or court having jurisdiction in such cases

that the complainant believes that any of the provisions of law relating to or affecting children are being or are about to be violated in any particular building or place, such magistrate or court being satisfied that there is reasonable ground for such belief shall issue a warrant directed to the proper sheriff, constable, police officer or agent of such association, authorizing him to enter and search such building or place, and to arrest any person there present violating or attempting to violate any such law, and to bring such person before some court or magistrate of competent jurisdiction, together with the child or children concerning whom such offense has been committed, to be dealt with according to the law; and such attempt shall be held to be a violation of such law, and shall subject the person charged therewith, if found guilty, to the penalties provided for such violation." (Emphasis added.)

The principle case relied on by the people is *Delay* v. *Brainard* (1968), 182 Neb 509 (156 NW2d 14). However, the Nebraska statute is significantly different from the Michigan one just quoted. The Nebraska statute (§ 38–116, RRS 1943) provides:

"It shall be unlawful, and it is hereby declared to be cruelty for any person employing or having the care, custody or control of any child, willfully or negligently to cause or permit the life of such child to be endangered, or the health of such child to be injured, *or willfully to cause or permit such child to be placed in such a situation that its life or health may be endangered,* or to cause or permit such child to be overworked, cruelly beaten, tortured, tormented or mutilated." (Emphasis added.)

Thus, the Nebraska statute makes it cruelty for a person having the care, custody or control of any child to willfully permit such child to be placed in a situation such that its life or health *may be endangered.* However, the comparable part of the

Michigan statute makes it cruelty for a person under whose protection any child may be to *habitually* cause or permit the health of such child to be injured, his life endangered by exposure, want or other injury to his person. Apparently the Michigan legislature had in mind cases where a child's health is injured by repeated beatings or his life is endangered by lack of shelter or food or by other injury to his body. This part of the Michigan statute is more limited than the comparable part of the Nebraska statute which refers to a situation where life or health may be endangered but does not restrict or limit the way in which the danger occurs.

Additionally, the *Delay* case was a review of a proceeding on a petition for a writ of habeas corpus by Mrs. Delay, who was charged with manslaughter. The district court had granted the writ and Sheriff Brainard appealed. The issue was whether the evidence was sufficient to show that a crime was committed. In a split decision the Nebraska Supreme Court held that the mother (Mrs. Delay) was in violation of the child cruelty statute when she locked her three children under four years of age in the house and took off on her own pleasure. Her husband had left the house before 7 a.m. and she apparently left about 9 a.m. and spent some time in her paramour's apartment. She planned to be back home in time to get her husband's lunch at noon. The fire alarm was turned in at 9:45 a.m. and the mother was located at a bar about 10:25 a.m. The majority of the court stated they could not as a matter of law say that the mother could not be guilty of manslaughter, even though a gross breach of duty and not a slight breach was required. The court reversed, ordering the accused to stand trial and stating that it was for a jury to determine whether the conduct of the accused crossed the line

where her breach of duty rendered her criminally negligent.

It is elementary law, however, that it is not necessary that the evidence at a preliminary hearing be sufficient to support a verdict of guilty after a trial. The purpose of a preliminary hearing is not to determine guilt or innocence. 1 Gillespie, Michigan Criminal Law and Procedure, §§ 306, 307, pp 364, 365.

In deciding this case Chief Justice White's concurring opinion in the *Delay* case has been of more help than the majority opinion because of his discussion of the issue of proximate cause and the reasonable foreseeability of the harm. I quote with approval from his opinion, pp 521, 522:

"The record before us reveals grave questions as to the issue of proximate cause. I fail to see, at this point, how defendant's clandestine purpose or motivation in visiting her paramour is at all relevant to either the issue of neglect or proximate cause. This is a manslaughter case, and intent or purpose or motive is immaterial. Her conduct would be neither more nor less culpable or causative if her absence was for the purpose of visiting her minister, or, for that matter, absenting herself to consult with a social welfare agency about the care of her children. Is the fact that she removed herself from the visual proximity of her children, or the length of time that she so removed herself, the competent producing or proximate cause of the child's death? The direct cause of this child's death was a fire occurring not more than an hour and a half or two hours after she left the home. Just how the balance of the three or four hour period of time she was gone is relevant to the establishment of the issues of neglect and proximate cause in this case does not appear at this time. I see considerable difference, even as a matter of law, between a case in which a hungry child after being left alone all

day drinks a bottle of poison liquid left exposed, and one in which a child is killed in a crib as a result of fire a few minutes after the mother has left (even in her own home) and is out of the visual and hearing proximity of her child for a considerable time later. And, it may be that the detailed facts surrounding the exact location of the child, the previous conduct of the mother, and the possible conditions which might result in danger to the child which were present and should have been known to the defendant, all may be highly relevant to determine the crucial issue of guilt and proximate cause in this case. I shall not take the facts as they rather sketchily appear in this record and attempt to relate them precisely to the rationale of the relevant rules of law as to proximate cause. *Intentional misconduct is irrelevant but reasonably foreseeable harm and the legally imposed risk resulting therefrom are highly relevant issues.* The close question of whether they may be determined as a matter of law or whether they present a jury question must abide determination of the case on its merits." (Emphasis added.)

Applying Chief Justice White's reasoning to the case before us, I think defendant's purpose in leaving the house is immaterial in an involuntary manslaughter case. The direct cause of the death of William Ogg, Jr., was an accidental fire occurring not more than an hour and a half or two hours after defendant left home. The balance of the time she was gone is irrelevant to the issues of cruelty, neglect, and proximate cause. Similarly, evidence regarding the small size of the room, its lack of bathroom facilities, its lack of heat and light, the lack of clothing and bedding and food are all irrelevant to a death caused by an accidental fire because those factors did not in any way contribute to or cause the death. Heat and clothing would have been relevant if the deceased had died from

freezing to death just as food would have been relevant if he had died from starvation. They are not relevant to a death caused by an accidental fire.

The only other factually similar case called to attention is *People* v. *Rodriguez* (1960), 186 Cal App 2d 433 (8 Cal Rptr 863), *hearing denied.* In a non-jury trial defendant was found guilty of involuntary manslaughter. She had left four children between the ages of two and six locked in the house. Additional facts taken from pages 435 and 436 of the court's opinion are:

"Olive Faison lived across the street from defendant. About 10:45 p.m. on November 8, 1959 Miss Faison heard some children calling, 'Mommy, mommy.' For about 15 or 20 minutes she did not 'pay too much attention.' She noticed the cries became more shrill. She went to the front window and saw smoke coming from defendant's house. She 'ran across the street and commenced to knock the door in and started pulling the children out.' There was a screen door on the outside and a wooden door inside the screen door. The screen door was padlocked on the outside. The other door was open. She broke the screen door and with the help of neighbors pulled three of the children out of the house. She tried to get into the house through the front door but could not because of the flames. A neighbor entered through the back door but could not go far because of the flames. Miss Faison took the three children to her apartment and shortly thereafter returned to the scene of the fire. She remained 'until after the little boy was brought out and revived and sent to the hospital.' Miss Faison did not see defendant around the house or the neighborhood at the time of the fire.

"Firemen arrived at the scene some time after 10 p.m. The front door was open; there was no obstruction. Fireman Hansen went inside and found a baby boy in the back bedroom near the bed. The

fire was about 3 feet away from the boy. Hansen took the boy out of the house. 'He appeared to be dead at the time.' The child was Carlos Quinones.

"Around 4 or 4:30 p.m. on November 8, 1959 defendant was in 'Johnny's Place.' She was at the bar drinking 'coke.' She stayed about an hour. As John Powers, one of the bartenders, was closing the place about 2:30 a.m. on the morning of November 9, he saw defendant outside the building. He had not seen her inside before that time.

"Maria Lucero, defendant's sister, went to defendant's home about 12 p.m. on November 8, 1959. She went looking for defendant. She found her about 2 or 2:30 a.m. in the same block as 'Johnny's Place.' Defendant was nervous and frightened, said she knew about the fire and that she went over to tell Johnny Powers about it. Defendant had not been drinking."

It was contended by the Attorney General in the *Rodriguez* case that defendant had violated the child cruelty statute and therefore had committed an unlawful act within the meaning of the statute defining involuntary manslaughter as "Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Penal Code, § 192).

The California child cruelty statute (Penal Code, § 273a) stated:

"Any person who willfully causes or permits any child to suffer, or who inflicts thereon unjustifiable physical pain or mental suffering, and whoever, having the care or custody of any child, causes or permits the life or limb of such child to be endangered, or the health of such child to be injured, and any person who willfully causes or permits such child to be placed in such situation that its life or

limb may be endangered, or its health likely to be injured, is guilty of a misdemeanor."

The California appellate court, after discussing the pertinent statutes and two earlier California cases, dealing with involuntary manslaughter stated at pp 440, 441:

"It is generally held that an act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm. The risk of death or great bodily harm must be great. See cases collected 161 ALR 10. Whether the conduct of defendant was wanton or reckless so as to warrant conviction of manslaughter must be determined from the conduct itself and not from the resultant harm. *Commonwealth* v. *Bouvier,* 316 Mass 489, (55 NE2d 913). Criminal liability cannot be predicated on every careless act merely because its carelessness results in injury to another. *People* v. *Sikes,* 328 Ill 64 (159 NE 293, 297). The act must be one which has knowable and apparent potentialities for resulting in death. Mere inattention or mistake in judgment resulting even in death of another is not criminal unless the quality of the act makes it so. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the accused tended to endanger life. *State* v. *Studebaker,* 334 Mo 471 (66 SW2d 877, 881).

"In a case of involuntary manslaughter the criminal negligence of the accused must be the proximate cause of the death. (Citations omitted.)

"It clearly appears from the definition of criminal negligence stated in *People* v. *Penny, supra,* 44 Cal 2d 861 (285 P2d 926), that knowledge, actual or imputed, that the act of the slayer tended to endanger life and that the fatal consequences of the negligent act could reasonably have been foreseen are necessary for negligence to be criminal at all. Must a parent never leave a young child alone in the house

on risk of being adjudged guilty of manslaughter if some unforseeable occurrence causes the death of the child? The only reasonable view of the evidence is that the death of Carlos was the result of misadventure and not the natural and probable result of a criminally negligent act. There was no evidence from which it can be inferred that defendant realized her conduct would in all probability produce death. There was no evidence as to the cause of the fire, as to how or where it started. There was no evidence connecting defendant in any way with the fire. There was no evidence that defendant could reasonably have foreseen there was a probability that fire would ignite in the house and that Carlos would be burned to death. The most that can be said is that defendant may have been negligent; but mere negligence is not sufficient to authorize a conviction of involuntary manslaughter." (Citations omitted.)

While there are no Michigan cases which are factually similar, there are Michigan cases involving involuntary manslaughter which make it clear that to sustain a conviction of manslaughter the conduct of the accused must have been the immediate and direct cause of the death, and must have been characterized by such a degree of culpable negligence as to amount to gross negligence. In *People* v. *Beardsley* (1907), 150 Mich 206, 209 the court stated:

"The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. 21 Cyc p 770 *et seq.,* and cases cited. This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death." (Citations omitted.)

In *People* v. *Barnes* (1914), 182 Mich 179, 198, 199 the court said:

"The crime sought to be proven was involuntary homicide, caused by culpable negligence, and, to make an act carelessly performed resulting in death a criminal one, the carelessness must have been gross, implying an indifference to consequences; and the term 'gross negligence' means something more than mere negligence. It means wantonness and disregard of the consequences which may ensue, and indifference to the rights of others that is equivalent to a criminal intent.

"Not every degree of carelessness or negligence, if death ensues, renders the party guilty of manslaughter. The case may be one of mere misadventure. To warrant conviction, it must be gross negligence. It has been well said that there is little distinction, except in degree, between a will to do a wrongful thing and an indifference whether it be done or not. Therefore gross negligence is criminal, and within limits supplies the place of affirmative criminal intent.

"An unavoidable crime is a contradiction. Whatever is unavoidable is no crime. As in the law of civil wrongs, so in the criminal law, to render one answerable for an offense, it must result from his act as an effect not too remote but sufficiently proximate thereto.

"To warrant a conviction of manslaughter, the conduct of the accused must have been the proximate cause of death, and must have been characterized by such a degree of culpable negligence as to amount to gross negligence; and that is a question for the jury.

"The ultimate inquiry should be: Was the respondent criminally negligent, and, if so, did his criminal negligence cause the death of the deceased?" (Citation omitted.)

In the present case defendant's conduct is distinguishable from that in the *Delay* and *Rodriguez* cases, *supra*. In those cases children were locked in a house, whereas in this case they were locked in a windowless upstairs room, approximately 6 feet by 11 feet, with sloping ceiling. However, William Ogg, Jr., was mentally retarded and there was testimony that he or Philip had set fires in the house in the preceding June and October when their parents were at home. Thus, it was foreseeable in this case that the deceased might have started a fire in the house if he had not been confined in his room. Additionally, there was testimony that when he and Philip occupied an upstairs bedroom with a window in it, they climbed out the window and thereby became in danger of falling to the ground.

While I certainly do not approve defendant's standard of care of the deceased, I do not think it was proven to be the direct and immediate cause of the death. Had the fire not occurred, deceased would be alive. The accidental fire of undetermined origin, which started on the first floor, was not reasonably foreseeable in my opinion. I would hold as a matter of law that these facts will not sustain a conviction for involuntary manslaughter.