STATE of Tennessee, Appellee,

v.

**Elizabeth DAVIS, Appellant.**

No. 01–C–01–9001–CC–00015.

Court of Criminal Appeals of Tennessee, at Nashville.

June 8, 1990.

Sam Wallace, Sr., Nashville, for appellant.

Charles W. Burson, Atty. Gen., Kymberly Anne Hattaway, Asst. Atty. Gen., Nashville, Guy R. Dotson, Dist. Atty. Gen., William C. Whitesell, Gerald Melton, Asst. Dist. Atty. Gen., Murfreesboro, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of involuntary manslaughter and received a sentence of two years in the state penitentiary as a Range I, standard offender. Her application for probation was granted and she was placed on supervised probation for two years.

On appeal she has presented six issues. Taken together, five challenge the sufficiency of the convicting evidence. So far as we can ascertain, this is a case of first impression in Tennessee. The case arises out of the accidental drowning of the appellant's two year old child.

The appellant lived in an apartment at Lakeside Apartments in Murfreesboro with her husband, her mother, her younger brother and her two year old son.[1] On August 11, 1988, her son, Michael Hughes, was pulled from the swimming pool at the apartment complex by fifteen year old Jason Clardy. Mr. Clardy saw the victim earlier in the afternoon with the appellant's husband, who was working on his truck in front of one of the buildings in the apartment complex. The victim was playing with the other little children.

Later that afternoon the appellant and her husband began looking for the child and they asked Mr. Clardy and the other older youngsters if they had seen him.

1. The appellant's mother and brother had moved to another apartment a few days before, but she was visiting her daughter on the date of the death.

Thinking that he might have wandered into the woods behind the apartment complex, Mr. Clardy and one of his friends went to look for him. Mr. Clardy spotted the child in the shallow end of the pool and pulled him out. Resuscitation efforts were undertaken by the appellant's mother, who is a licensed practical nurse, and by paramedics summoned to the scene. The child was taken to Vanderbilt University Medical Center in Nashville by Life Flite helicopter, but all efforts to resuscitate him failed and he was later pronounced dead by physicians at Vanderbilt. Dr. Mona Gretel Harlan, the Assistant Davidson County Medical Examiner, performed the autopsy on the victim and determined that the cause of death was drowning.

The state's proof consisted of Mr. Clardy, Billy Howard Hadnot, who had been the resident manager for four buildings at Lakeside Apartments and the common areas, James W. Steele, who succeeded Mr. Hadnot, Dr. Harlan, Major Sally Walls of the Symrna Police Department, Judith Marie Webber, a child protective services worker with the Tennessee Department of Human Services, and Sally N. Randolph, a neighbor, who had reported the appellant's neglect of her child.

In addition to Mr. Clardy's description of his rescue of the victim, the state's proof centered on the operation of the pool, the victim's attraction to it and the appellant's prior neglect of him.

As to the pool, the proof showed that the latches on the two gates had been installed quite low, making it possible for the little children to open them at will. About three weeks before the victim's death, Mr. Hadnot and the appellant's husband, Mark Anthony Davis, II, moved the latches up to a point where the victim could only touch it with his fingertips. However, it was possible for him to reach the latches by standing on a gutter.

The state's evidence was in dispute about whether the pool was closed on the date of the drowning. According to Mr. Clardy, it had already been announced that the pool would be closed for cleaning. Mr. Steele disputed that, contending that the pool was not closed or going to be. Ms. Randolph agreed with Mr. Clardy that, according to her understanding, the pool was to be closed that day.

As to the victim's attraction to the pool, the proof showed that he was a precocious, inquisitive little boy. He was, like most youngsters, attracted to the pool and Mr. Clardy had taken him home from the pool area once or twice the month before. Mr. Hadnot recalled that the victim came over five or six times during the five weeks that they had worked on the pool to get it in shape for opening.[2] At least three times he was unattended by an adult. Mr. Hadnot had taken him out of the pool area twice. On one occasion the victim walked down the steps of the pool into the water with his shoes on. On the other occasion he was near the pool, but not in it.

As to the appellant's prior neglect of her son, Mrs. Randolph testified that she first met the victim in May when he fell on a skateboard at the tennis court. She took him home and then returned to the park. The boy returned alone to the park immediately and continued to play. Two weeks later she took him home when he flipped out of a swing and landed on his stomach. On a third occasion, she and her husband saw the child, who started coming toward her calling her "mommy." Rather than deal with the child, Mrs. Randolph and her husband left. She called the Department of Human Services and reported the child as being neglected.

Ms. Webber investigated several complaints that she received concerning the appellant's neglect of her child. Her investigation began in February 1988 and continued through July 7, 1988. Ms. Webber had no contact with the appellant after July 7. She had insisted that the appellant fix a latch on the storm door to her apartment which allowed the child to come and go at will.

2. The pool had apparently been neglected for some time and a great deal of work was neces-

sary to prepare it for reopening.

Major Walls had known the appellant for a long time. She went to the appellant's home after the death of the child to see if she could help the appellant and also to see if the latch had been repaired as required by Ms. Webber.

That was the state's case. No proof was presented by the prosecution concerning the circumstances of the child's death, except that he drowned. The defense, through the testimony of the appellant, her husband, her mother and father, and a neighbor filled in the details of that fateful day.

The appellant was in her fourth month of pregnancy and she and her mother went to Wal–Mart to buy her some maternity clothes. While they went to the store, the victim stayed with the appellant's husband, who was repairing a truck outside in the apartment complex. They returned home between 4:30 and 5:00 o'clock P.M., and she and her mother sat on the steps of the apartment. Her husband was still outside working on the truck and the victim was playing in the yard. According to the appellant's mother, Catherine Driver, he was within five or six feet of her playing with the other youngsters. The appellant began to feel nauseated and she went into the apartment where she vomited. She changed clothes and laid down for a time. She estimated that she was in the house for thirty to thirty-five minutes. At about 6:00 or 6:15 P.M., she went back outside and asked her mother where her son was. Mrs. Driver said she didn't know, so they asked the appellant's husband. He responded that he thought the child was with Mrs. Driver.

Two ladies were sitting in lawn chairs near where Mr. Davis was working on his truck. When asked if they had seen the child, they responded that he went with the other children to the back of the apartments to look at a mushroom or toadstool that one of the children had discovered.

Katherine Christine VanBrooker, and another lady named Cindy, were sitting outside. She and Cindy were watching the children. She remembered that the appellant had asked if it was all right for her son to play there with the other children and she agreed that it was. There were forty to fifty children in the apartment complex and Ms. VanBrooker testified that all the adults watched everyone's children.

Mrs. Driver testified that she was watching her grandson for the appellant, but that he "darted off" and that she did not see him again until he was found in the pool. James David Hughes, Mrs. Driver's former husband, and the appellant's father, testified that two or three weeks prior to the drowning that his grandson was visiting him and that he was playing outside as he cleaned his garage. He recounted that the child slipped away from him unnoticed and was found across the street in a neighbor's yard. Mr. Hughes described his grandson as a "very active," "curious," "lively," "normal boy."

Based upon this proof, the jury found the appellant guilty of involuntary manslaughter.[3]

 The rules of appellate review of jury verdicts are well established. A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn. 1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

However, this case presents an important legal question as to how the law is applied to the facts of the case.

Involuntary manslaughter is the unlawful killing of another without malice, either

---

**3.** It apparently was not an easy decision for the jury. They deliberated for a total of seven hours and twenty-three minutes. After just over six hours of deliberation, they sent the judge a note which stated: "Are we to base our verdict on a pattern of neglect, leading up to and in-cluding August the 11th, 1988, or neglect solely on the day of the drowning?" Because the counsel could not agree as to how he should respond to the question, the trial judge refused to answer it at all.

express or implied, that occurs in the commission of some unlawful act. T.C.A. § 39–2–221.[4] In Tennessee three categories of involuntary manslaughter cases have been recognized by our courts. First are the cases where death resulted from the commission of an act which was malum in se. In *Keller v. State*, 155 Tenn. 633, 299 S.W. 803, 804 (1927), our Supreme Court held that driving an automobile under the influence of an intoxicant is malum in se and, therefore, the doing of the act "suppl(ied) the criminal intent" necessary for a conviction of involuntary manslaughter. In *Whitlock v. State*, 187 Tenn. 522, 216 S.W.2d 22, 24 (1948), our Supreme Court found that assault and battery is malum in se and, therefore, the doing of the act is sufficient to support a conviction.[5]

The second category of cases are those in which the unlawful act was malum prohibitum.[6] In those cases it must be shown that the death of the victim was the "natural or probable result of the unlawful act." *Holder v. State*, 152 Tenn. 390, 277 S.W. 900 (1925). In that case the defendant was carrying a concealed weapon in violation of a statute. This act was malum prohibitum and our Supreme Court noted that "something more should appear than that he merely carried a pistol in violation of the statute." The Court went on to hold that "(i)t must appear that he pointed the pistol at the deceased, or intentionally shot it so as to endanger deceased, or otherwise handled the weapon in such a manner as to make the killing of deceased a natural or probable result of such conduct." *Id.* Acts malum prohibitum do not supply the criminal intent necessary to render one punishable for manslaughter unless "something more" than an accidental death is shown in the proof. *Id.*

In *Copeland v. State*, 154 Tenn. 7, 285 S.W. 565 (1926), the deceased child was walking or riding on the coupling pole of a log wagon, laden with logs. The victim ran from behind the wagon into the path of the defendant's automobile, which was being driven at twenty to thirty miles per hour according to the witnesses. The statutory speed limit at the time was twenty miles per hour. The Supreme Court noted that it could not be said that the death was caused by the exceeding of the speed limit. It was necessary that it appear that "the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act."

In *Brown v. State*, 201 Tenn. 50, 296 S.W.2d 848, 849 (1956), the defendant was convicted of involuntary manslaughter after his passenger was killed in an automobile crash. The wreck resulted from the defendant's car being on the wrong side of the road as he attempted to pass another car on the crest of a hill. The Court noted that passing another on a hill when the view is obstructed is recognized as being "completely negligent" and the violation of the statute "proximately caused" the collision and the resulting death.

The final category of cases is those in which the defendant's gross and culpable negligence caused the victim's death. In *Roe v. State*, 210 Tenn. 282, 358 S.W.2d 308, 314–315 (1962), the defendant ran over or dragged her husband with her automobile after they had had an altercation about his drunken condition. The Court first noted that there was no proof that she was intoxicated and driving under the influence so as to make her guilty of an act malum in se. Next, the Court found that there was no proof that she committed any statutory violation that was malum prohibitum. Finally, the Court went on to determine whether she was guilty of "any gross or culpable negligence, or of any criminal want of caution or circumspection," which brought about the death. The Court found that she was. While the deceased was

---

**4.** Effective November 1, 1989, this offense is now known as "criminally negligent homicide." T.C.A. § 39–13–208(a).

**5.** Our Supreme Court defined malum in se as "(a)n act involving illegality from the very na-

ture of the transaction, upon principles of natural, moral, and public law." *Id.*

**6.** Our Supreme Court defined malum prohibitum as "(a)n act made wrong by legislation; a forbidden evil." *Id.*

"drunk and disagreeable" and was hanging onto her car, she speeded up the car and caused him to be violently thrown to the pavement or to be run over by the car. The Court found that she either "knew or reasonably should have known, that her speeding up the car, in these circumstances, might endanger his life" and that her conduct in so doing constituted "culpable, criminal negligence" from which her husband's death was the "natural and probable consequence," rendering her guilty of involuntary manslaughter.

This case fits into none of these categories. Furthermore, an examination of cases from other jurisdictions has revealed no case directly in point. However, the reasoning from some of those cases is helpful to our resolution of the issues in this case.

In *Delay v. Brainard*, 182 Neb. 509, 156 N.W.2d 14, 19 (1968), a woman left her children, ages three and a half, one and a half and six months, at home alone while she went out with her boyfriend. The house caught fire and the youngest child died from burns to over 80% of his body. The Court held that it was culpable negligence to fail to perform her legal duty to look after her young children.

In *People v. Ogg*, 26 Mich.App. 372, 182 N.W.2d 570, 575–576 (1970), the parents left two boys, ages four and five, locked in a closet without windows or lights. They left for work that morning without even checking on the children.[7] During their absence the house caught fire and the children died. The Court held that their culpable negligence was the cause of the deaths and, therefore, they were guilty of involuntary manslaughter. However, there was a vigorous dissent by Danhof, J. that they were not guilty of manslaughter because the direct and proximate cause of the deaths was the accidental fire, and not the actions of the parents. 182 N.W.2d at 578–582.

In *People v. Finney*, 117 Mich.App. 442, 324 N.W.2d 43, 45 (1982), two children were *left alone for over two hours in a room* with matches. They set the house on fire and perished in the resulting blaze. The Court held that this was "not merely bad judgment" but gross negligence.

In *People v. Rodriguez*, 186 Cal.App.2d 433, 8 Cal.Rptr. 863, 868 (1960), a mother left four children in the home with the screen door padlocked. The oldest child was six. The house burned and she was charged with involuntary manslaughter. The conviction was reversed, the Court noting that involuntary manslaughter convictions can result only from criminal negligence and that the negligence must be the proximate cause of the deaths. The Court defined an act as criminal negligence "when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm." Whether the conduct of the defendant was "wanton or reckless" so as to warrant conviction of manslaughter must be determined "from the conduct itself and *not from the resultant harm.*" Criminal liability cannot be predicated upon every careless act merely because the carelessness resulted in an injury to another. The act must be one which has "knowable and apparent potentialities for resulting in death." "Mere inattention" or a "mistake in judgment" resulting in death is not criminal unless the quality of the act makes it so. The fundamental requirement for criminal responsibility is "knowledge" either actual or imputed, that the act of the accused tended to endanger life. In cases of involuntary manslaughter, the criminal negligence of the accused must be the proximate cause of the death.

In this case there was no criminal negligence by the appellant on the day of the drowning. Indeed, it is not even apparent that there was any ordinary negligence on her part. Ordinary negligence will not support a conviction for involuntary manslaughter. *Roe v. State*, supra. She left the child in the care of *her own mother, the grandmother of the victim.* A short distance away was the appellant's husband, the stepfather of the victim, who had kept

---

7. They had last checked on the children at 7:30 P.M. the night before.

the child, without incident, earlier in the day.

At oral argument the state had the temerity to suggest that it was gross negligence for this mother to let her child out at all, but suggested that the child, due to his inquisitiveness, should have been kept locked in the apartment at all times. That suggestion is so unrealistic as to require no further elaboration. What was more realistic on a summer afternoon was to let this child play with the neighborhood children in the presence of and under the watchcare of the grandmother and the stepfather. If there was any negligence in letting the child "dart off," it was their negligence, not the negligence of the mother. It is obvious from the jury's question that her neglect of her child in the past weighed heavily in their determination that she was guilty of involuntary manslaughter.

To paraphrase the court in *People v. Rodriguez, Id.,* "(m)ust a parent never leave a young child (in the care of other relatives) on risk of being adjudged guilty of manslaughter if some unforeseeable occurrence causes the death of the child?" We think not. It is clear that while this appellant was obviously neglectful of her child on other occasions, there is no proof that there was any neglect by her on this occasion.

The issues challenging the sufficiency of the evidence have merit. The judgment is reversed and this cause is dismissed. It is, of course, unnecessary to address the other issue, which challenged the propriety of the admission of the evidence of prior neglect.

JONES and REID, JJ., concur.